## FILOR *v.* UNITED STATES.

1. The act of Congress of July 4th, 1864 (13 Stat. at Large, 381), declares "that the jurisdiction of the Court of Claims shall not extend to, or include, any claim against the United States, growing out of the destruction or *appropriation* of, or damage to, property by the army or navy, or any part of the army or navy engaged in the suppression of the rebellion, from the commencement to the close thereof." Under this act *held*, that the term "appropriation" includes all taking and use of property by the army or navy, in the course of the war, not authorized by contract with the government.

2. No lease of premises at Key West for the use of the quartermaster's department, or any branch of it, in 1862, made by the acting assistant quartermaster at that place, was binding upon the government until approved by the quartermaster-general, though the action of the subordinate officer in making such lease was taken by direction of the military commander at that station. Until such approval the action of the officers at Key West was ineffectual to fix any liability upon the government. The obligation of the government for the use of the property is what it would have been if the possession had been taken and held without the existence of the lease.

---

* License Cases, 5 Howard, 504; Passenger Cases, 7 Id. 283; License Tax Cases, 5 Wallace, 470; and the cases cited.

3. The unauthorized acts of the officers at Key West cannot estop the government from insisting upon their invalidity, however beneficial they may have proved to the United States.

APPEAL from the Court of Claims. The material facts of this case, as found by the court, were thus:

In 1861 one Asa F. Tift, a citizen of Florida, was the owner in fee of certain real property, situated in Key West, in that State, known as Tift's wharf. In January of that year he was a member of the convention which passed the ordinance of secession, purporting to dissolve the connection of the State with the National Union, and signed the ordinance. In May following, with the intention of joining the Confederates against the United States, he left Key West and removed to the State of Georgia, where he resided during the continuance of the rebellion. Before leaving Key West he executed a power of attorney to one Charles Tift, authorizing him to sell and convey all his property, or any part of it, situated on that island. In December, 1861, through his attorney, he sold and conveyed the premises to the petitioners, as tenants in common, for the consideration of eighteen thousand dollars, for which sum they gave their several promissory notes, according to their respective proportions, of which three, each for one thousand dollars, were payable on demand, and the residue were payable from one to five years, with annual interest at six per cent. These notes were retained by the attorney under an agreement between him and the makers until after Asa S. Tift had received from the President a full pardon for offences committed by participation in the rebellion, which was granted in July, 1865. They were then delivered to him.

After the purchase made by the petitioners the officers of the quartermaster's department at Key West desired possession of the wharf, and its appurtenances, for the use of the United States, but the petitioners refused to lease the property. Thereupon the commanding officer at Key West, "for the purpose of effecting a lease of it" (such is the language of the finding), issued an order for its seizure "for the use of

the quartermaster's department of the United States army."
Under the pressure of this order an agreement was concluded
between Filor, one of the petitioners, acting for all of them,
and Lieutenant Gibbs, of the United States army, at the time
assistant quartermaster, who assumed to act on behalf of the
United States, which agreement purported to lease the prop-
erty, and various pieces of machinery, and other articles
connected with it, to the United States for one year from
January 1st, 1862, and as much longer as might be required
by the quartermaster's department, at an annual rent of six
thousand dollars, payable quarterly.   This agreement was
approved by the commanding officer at Key West, but was
not approved by the quartermaster-general, nor was it disap-
proved by him until February 8th, 1866.   Under the agree-
ment the officers of the quartermaster's department at Key
West entered upon and took possession of the premises, and
ised them in the service of the United States until the 1st
of January, 1867.

No rent was ever paid to the petitioners under the agree-
ment, or for the use and occupation of the premises, and to
recover the full amount stipulated for the five years, the
present suit was brought.

When the agreement was made, and possession was taken
of the premises, the officers of the quartermaster's depart-
ment at Key West had full knowledge of the fact that Asa
F. Tift had adhered to Florida in her attempted secession
from the Union, and had joined the Confederates in Georgia,
and was, with them, in open war against the United States at
the time the deed was executed to the petitioners.

The Court of Claims held that the deed was void, as a
contract between enemies, and that the officers of the quar-
termaster's department at Key West were not authorized to
hire for the United States the premises, the title to which was
invalid, from the circumstances stated, which were known to
them at the time.

*Mr. Thomas Wilson, for the appellant.   Mr. Talbot, contra, for
the United States,* was stopped by the court.

Mr. Justice FIELD, after stating the facts of the case, delivered the opinion of the court, as follows:

The determination of this case does not depend upon the validity or invalidity of the title of the petitioners to the property in question. The difficulty with their claim does not arise, as the court below appears to have considered, solely from the supposed invalidity of their title. There is a difficulty from another quarter. We do not find, in any regulation of the army, or in any act of Congress, that the acting assistant quartermaster at Key West was invested with power to bind the United States to the agreement or lease produced, even though his action was taken by direction of the military commander at that station, and the instrument was approved by him. No lease of premises for the use of the quartermaster's department, or any branch of it, could be binding upon the government until approved by the quartermaster-general. Until such approval the action of the officers at Key West was as ineffectual to fix any liability upon the government as if they had been entirely disconnected from the public service. The agreement or lease was, so far as the government is concerned, the work of strangers. The obligation of the government for the use of the property is exactly what it would have been if the possession had been taken and held without the existence of the agreement. Any obligation of that character cannot be considered by the Court of Claims. The jurisdiction of that court, says the act of Congress of July 4th, 1864, "shall not extend to, or include, any claim against the United States, growing out of the destruction or *appropriation* of, or damage to, property by the army or navy, or any part of the army or navy engaged in the suppression of the rebellion, from the commencement to the close thereof."* The premises of the petitioners were thus appropriated by a portion of the army. It matters not that the petitioners, supposing that the officers at Key West could bind the government to pay a stipulated rent for the premises, consented to such appropriation. The manner of

---

* 13 Stat. at Large, 381.

the appropriation, whether made by force or upon the consent of the owner, does not affect the question of jurisdiction. The consideration of *any* claim, whatever its character, growing out of such appropriation, is excluded.   The term appropriation is of the broadest import: it includes all taking and use of property by the army or navy, in the course of the war, not authorized by contract with the government.   The use may be permanent or temporary, and it may result in the destruction of or mere injury to the property.   If the right to the property, or to its use, is not obtained by valid contract with the government, the taking or use of it is an appropriation within the meaning of the act of Congress.

The learned counsel of the petitioners is correct in stating that leasing and appropriation are different acts, but he errs when he assumes that the instrument in this case has any greater validity as the act of the government than if it had been signed by himself.

The doctrine of estoppel, which the counsel invokes, has no application.   There is no place where the doctrine can come in.   The officers at Key West did not represent the United States, except in their military capacity, though assuming to do so.   In signing the agreement, and in taking possession of the premises claimed by the petitioners, they acted on their own responsibility.   Their unauthorized acts cannot estop the government from insisting upon their invalidity, however beneficial they may have proved to the United States.   If the petitioners are entitled to compensation for the use of the property they must seek it from Congress.   The Court of Claims can award them none.

JUDGMENT AFFIRMED.