Davis, J.,
delivered the opinion of the court:
But one question is involved in this case: whether the contract made by the assistant quartermaster binds the defendants. The contract was made in good faith on both sides. It was duly transmitted by the assistant quartermaster to his superior. The claimant in good faith incurred considerable expense to carry it out. He was stopped in its execution through no fault of his and in consequence of a fact which the assistant quartermaster could not have known when the contract was made. He has been paid the actual expenses so incurred in order to execute his contract. It is agreed that he suffered a further loss of $1,303 profits, which he is entitled to if he can recover anything. He now sues to recover that sum and the government resists the recovery solely on the ground that the assistant quartermaster had no authority to make the ■contract, and that the contract he did assume to make was disapproved by his superiors.
The learned counsel for the government relies upon the cases of Parish (8 Wall., 498) and Filor (9 Wall., 45). He maintains that the former case decides that contracts of subordinates in the field or at a post are invalid and absolutely inoperative until approved by the superior officer; and that the latter reaffirms this doctrine and specially applies it to assistant quartermasters. The cases he cites do not quite come up to his contention. It forms part of the statement in Parish’s Case, that “ it was understood between the parties that this contract was not to be binding until it should receive the approval of the Surgeon-General, to whom it was forwarded.” In Filor’s Case, the Supreme Court say that they “ do not find in any regulation of the Army, or in any act of Congress, that the acting quartermaster at Key West was invested with power to bind the United States to the agreement or lease,” during the war, of the property of a citizen of Florida who u was a member of the convention which passed the ordinance of secession.” The military occupation of such property within the limits of Florida *260 was, they say, an 11 appropriation of it ” by the Army within the meaning of the act of July 4,1864, which could not be converted into a contract by an unauthorized act of an assistant quartermaster. We therefore regard the authority of Parish’s Case as confined to contracts which expressly provide for an approval of the superior officer; andthatofFilor’s Caseasatthe most applicable to leases of real estate, if it is not confined to leases made as set forth in the statement in that case. For reasons which will appear in this opinion, we do not think that the language, which the court in Filor’s Case carefully limited to contracts for the use of real estate, was intended by them to apply to all contracts in the Quartermaster’s Department. Whether it should be applied to the present contract we now proceed to consider.
Before "entering upon the inquiry, it is first to be observed that the claimant’s contract, having been made in July, 1865, is to be construed with reference to the provisions of the Act July 4,1864 (13 Stat. L., 394), and the regulations which were in force when it was entered into. No similar question can arise as to contracts concluded since July 14, 1879, because on that day the following general order was issued, and is now in force:
“I No contract for furnishing supplies or transportation to the Army will be considered in force until it has received the approval of the proper department commander; and when such department is located in the Military Division of the Missouri or Pacific, until such contract is approved by the commanding officer of such division; with the exception that where a post is very remote from department headquarters, the commanding officer of the district in which such post is located will be required to take this action. It will therefore be inserted, as a condition in all contracts, that they are made subject to the approval of such commanding officers.”
The considerations which we are about to present are founded on the relations which existed between the different departments of the Army prior to this order, and upon the laws, regulations, and orders which were in force in 1865.
Some military Powers vest the authority to dispose of the forces in the field and in garrisons, and the duty of providing them with quarters, barracks, hospitals, camp-equipments, clothing, forage, transportation, &c., in the same responsible general staff, and permit such duties to be performed by means *261 of purchases made in open market without special contracts. But our traditions led us in the conduct of the late war to a different system. We sex')arated the direction of our troops from the duty of providing for their wants and comfort. We vested in the Quartermaster-General and his subordinates a large part of these duties and we exacted their performance, except in cases of exigency, through the instrumentality of advertisements and contracts.
Our system had this disadvantage — that those who were to provide for the wants and comforts of troops did not know how many to x>rovide for, nor whether a post was to be continued, and had to depend upon another branch of the service for their information. The statutes, as if to obviate this difficulty and prevent collision, gave a large range of discretion to administrative officers. A series of early statutes had authorized the organization of a Quartermaster’s Dex>artment, with officers of various grades, and among them officers of a subordinate grade, called assistant quartermasters. The Act July 4,1864, already referred to (13 Stat. L., 394), organized that dex'tartment into several divisions, and placed the “ purchases, procurement, issue, and disposition of forage and straw for the Army” under the fifth division, subject to “such rules as might be prescribed by the Quartermaster-General with the approval of the Secre- • tary of War ” (§ 1). The head of that division was empowered, “ under the direction of the Quartermaster-General, from time to time to advertise for proposals for the supplies necessary for the post” (§ 2), and to purchase, or cause contract tobe made for the purchase of, such supxilies (§ 5). All quartermasters were required to report to the Quartermastef-General copies of all contracts made and all proj>osals received for supplies of any kind (§ 5). The eleventh section authorized the Secretary of War, during the continuance of the rebellion, to assign to each military department an officer to act as chief quartermaster of the department.
The practical effect of these statutes, and of the Army Begu-lations and Quartermaster’s Begulations made to enforce them, was this: Assistant-quartermasters were stationed at Army posts, and were directed to invite proposals for supplies, and to make contracts for them, and to transmit copies of the proposals and of all their contracts to the Quartermaster-General. They were not directed to, and did not, in fact, frame their written *262 contracts so as to require them to be approved by tbe Quartermaster-General. The transmission of the contracts to that officer was necessarily to be made through the proper military superior of the officer who made them: but the intermediate officer had no authority either by law or regulation to take any action upon the instruments.
The effect of this system and of the laws and regulations in force in 1865 upon the claimant’s contract is apparent. Fort Scott, which had once been an important post, had lost its consequence with the termination of the war. Whether it was to be abandoned or to be kept up was not to be decided by the Quartermaster’s Department. Until the officers of that department were told that it was to be discontinued, it was their duty to see that it was supplied with forage. Captain Bowles,‘who advertised for proposals for supplies and signed the contract with the claimant, was an assistant-quartermaster. In good faith and in ignorance of the counter purposes of another branch of the service, and in the strict line of his duty, he made his forage contracts. Before they could be performed the decision to abandon the post, made by those who had a right to decide whether it should or should not be continued, made it necessary to abrogate honest and fair contracts through the formal disapproval by the Quartermaster-General.
Now we have seen that the statutes and Army Begulations-of that time did not make the approval of the Quartermaster-General necessary in order to make the contracts of his subordinates .operative. There was a good reason why they did not. They were made during the rebellion, and for the purposes of' war. The war could not have been carried on if no contract for supplies could be enforced until it could be sent to the Quartermaster-General and be examined and approved by him. When the cessation of hostilities came, the state of the country still required the maintenance of a considerable military force.. The Quartermaster’s Department was still burdened, and, at the time of the conclusion of the contract with the claimant, it would seriously have embarrassed it if no steps could be taken under a forage contract until it could reach the Quartermaster-General’s table, and be taken up and considered and approved there. The claimant’s contract was signed on the 21st July. The hay was to be furnished for the wants of the coming winter. The chief quartermaster of the department did not transmit it to the Quartermaster-General until the 18th September,. *263 We do not know when tbe Quartermaster-General acted on it. It must, however, have been at a still later date. To expect the contractor, at that late day in the season, to purchase machines and to get together teams and mentó cut and cure before frost 1,500 tons of good hay would have been to expect an impossibility, which the law never demands.
Confining ourselves to the class of contracts Avhich, like this agreement, are free from fraud, and do not relate to real-estate, and call for immediate action in order to insure their performance according to their terms, we hold all such contracts, in form like the one set forth in the claimant’s petition, to be operative from the day of their signature, subject to be abrogated if disapproved by the Quartermaster-General. No rule short of this protects the citizen contractor against injustice at the hands of his government. If it is thought desirable to hold any such contract in abeyance until it can be passed upon by a superior officer, a clause to that effect should be in serted in the instrument, as is now- done.
The claimant’s right of recovery is to be measured by his rights at the time of abrogation. After the notice he could not go on and make needless damages. When he received it he had earned the right to be paid: 1st. The contract price for all hay then delivered; 2d. The amount then paid or incurred in good faith, in order to enable him to execute the unperformed part of his contract (Bulkley v. The United States, 19 Wall., 37), but none .subsequently incurred which could have been avoided at that time; 3d. His profits on the unexecuted part, which is defined to be the difference between the cost of executing the remainder of the contract and what he wag to receive for it, making reasonable deduction for the time engaged in it, and for release from the care, trouble, risk, and responsibility attending a full execution of the contract. (United States v. Speed, 8 Wall., 77.) If the hay which he had cut and had on hand when the contract was abrogated was or might have been made worth anything, the amount of that worth should also be deducted from the 2d and 3d items.
The findings show that the claimant has already been paid the 1st and 2d of these items; that he took 50 tons of the hay left on hand and allowed the government for it in the payments which have already been made to him; and that the amount of the 3d of the above items is $1,303. For this amount the claimant is entitled to judgment.