UNITED STATES *v.* CITY OF ALEXANDRIA and another.

(*Circuit Court, E. D. Virginia.* October 6, 1882.)

1. LIMITATION—GOVERNMENT.
    Time does not run against the sovereign government.
2. LACHES—AGENTS OF GOVERNMENT.
    The government is not chargeable with laches by reason of the procrastination of its officers.
3. LAPSE OF TIME—PUBLIC CORPORATIONS.
    Equity will not refuse to enforce an obligation merely because of the lapse of time, unless evidence has been lost, or the rights of third parties have become involved, or the personal relations between the parties have been so much altered as to change the essential character of the obligation. Governments and municipal corporations are of such a permanent nature that their mutual relations are presumably unaffected by the lapse of years.
4. SPECIFIC PERFORMANCE—AFTER-ACQUIRED TITLE.
    A party agreeing to transfer property which he does not own at the time, cannot refuse to perform his contract after acquiring title.
5. SAME—ONLY PART PERFORMANCE POSSIBLE.
    One who, by his own fault, is unable to perform a part of his contract, cannot upon that account resist a bill for the specific performance of the rest.
6. SAME—PECUNIARY DAMAGES REFUSED.
    Where congress authorized an advance of money to a city upon the surrender to the government of stock which it held, and the money was advanced but the stock was not transferred, *held* that, though specific performance of the obligation to transfer the stock would be decreed, no pecuniary damages could be awarded.

In Equity.

*H. H. Wells,* for plaintiff.

*Kemper, Johnson & Stewart,* for defendants.

HUGHES, J. The cities of Georgetown, Washington, and Alexandria united their corporate credit and resources with the United States, Virginia, and Maryland in the construction of the Chesapeake & Ohio canal. About the year 1836 they had exhausted themselves in this behalf, and the canal was unfinished. They applied to congress for relief. The form in which this relief should be given was not definitely settled upon in the first instance. But it finally took the form indicated in the "Act for the relief of the several corporate cities of the District of Columbia," passed May 20, 1836. 5 St. at Large, 32. The act provided that the three cities should convey the legal and equitable title in their stock to the secretary of the treasury, to be held in trust for the United States, with power in the secretary of the treasury "at such times, within ten years, as may be most favorable for the sale of the said stock, to dispose thereof at public sale, and reimburse to the United States such sums as may have been paid under the provisions of this act;" and "if any surplus remain after such reimbursement, he shall pay over such surplus to said cities." The plan was that the United States should pay certain debts of the three several cities, incurred on account of the canal, taking in lieu of them the shares they respectively held in the canal company. It was stated in argument at bar that the debts thus paid

by the United States in cash amounted to about 85 cents on the dollar of the par value of the stock received in exchange. While this measure was pending before congress, the city of Alexandria brought to the attention of that body, by an elaborately-drawn memorial, her embarrassment and urgent need of relief in respect to the Alexandria canal, which was an extension of the Chesapeake & Ohio canal from Georgetown into her own corporate limits. This memorial was presented in January, 1836. It simply asked relief, and did not suggest any form in which it should be given. In May the act for the relief of the three cities on account of the Chesapeake & Ohio canal was passed; and in December, 1836, Alexandria filed an additional memorial, suggesting that the relief which she separately asked should be in the form in which the three cities had received it in the act of May preceding, in respect to their indebtedness for the main canal. Alexandria's claim for relief in respect to her branch canal rested upon the same equities and considerations of public justice and policy on which that of the three cities had rested in respect to the main work. She then owned 3,500 shares of the stock of the Alexandria Canal Company, though it seems now that she had as yet completed paying for only 1,500 shares. There is nothing to show that congress was informed at this time of the fact that she had not yet paid up her subscription for part of her shares in the stock of the branch canal, and could not deliver them.

Congress responded favorably to Alexandria's separate and additional claim to relief in respect to her separate and branch canal. Congress voted $300,000 out of the treasury to Alexandria, which was almost precisely 85 per cent. of the par value of her 3,500 shares. The act by which this payment was authorized was passed on the third of March, 1837. See section 2 of chapter 44 of the acts of 1836–37, (5 St. at Large, 190.) The act provided—

"That when the corporate authorities of the town of Alexandria shall deposit the stock held by them in the Alexandria Canal Company in the hands of the secretary of the treasury, with proper and competent instruments and conveyances in law, to vest the same in the secretary of the treasury and his successors in office, for and on behalf of the United States, to be held in trust upon the same terms and conditions in all respects as the stock held in the Chesapeake & Ohio canal by the several cities of the district were required to be held in and by virtue of the act approved on the seventh day of June, eighteen hundred and thirty-six, entitled 'An act for the relief of the several corporate cities of the District of Columbia;' that the secretary of the treasury be and he is hereby authorized and empowered to advance, out of any moneys in the treasury not otherwise appropriated, to the canal company, from time to time, as the progress of the work may require the same, such sums of money, not exceeding three hundred thousand dollars, as may be necessary to complete the said canal to the town and harbor of Alexandria."

That act simply repeated, in respect to the branch canal, the policy and purpose of the act of the preceding May already mentioned, respecting the main work, and I cannot entertain a doubt that it was in the contemplation of congress that all the 3,500 shares which Al-

exandria had thus subscribed to the stock of the Alexandria Canal Company should be turned over to the secretary of the treasury on his payment to her of the $300,000 of cash appropriated by the act of March 3, 1837. To contend otherwise seems to me to be contrary to reason and all probability. Shortly after the act last mentioned, the authorities of Alexandria turned over to the secretary of the treasury, upon a payment then made by that officer of part of the sum that had been appropriated for the city, 1,500 shares of canal stock, which was all that she could then deliver. The secretary went on at different times to pay other installments of the appropriated $300,000 until all was paid. With this money Alexandria presumably completed the payment of her subscriptions on her remaining 2,000 shares of stock; but these shares were never delivered to the secretary of the treasury, nor never called for. I regard this omission as an act of sheer inadvertence. The stock became or had become absolutely valueless in the market; and it never seems to have occurred to the mind of any secretary of the treasury to call upon Alexandria for the undelivered 2,000 shares still due. The city afterwards subscribed for 1,500 additional shares of this stock in the Alexandria canal, making in all, with that delivered to the secretary of the treasury, 5,000 shares. Ten years after the act of congress which has been mentioned, she made an exchange of 2,720 of her shares with the state of Virginia for an equivalent amount of state bonds at par value, and has now only 780 left at her disposal.

The bill in this case is filed to require a specific performance by Alexandria of her obligation under the act of congress of March 3, 1837. I think that nothing could well be more clear than the obligation of Alexandria to comply with the prayer of the bill, by delivering to the secretary of the treasury the 2,000 additional shares of the stock of the Alexandria Canal Company still due. It is objected by her counsel that the lapse of time has been so great, and the laches of the United States so signal, that it would be inequitable now for Alexandria to be called upon to perform this obligation. But time does not run against the United States, and public policy forbids that the negligence of the officers of an immense government like ours should be held to create laches on the part of the government, except, probably, as to third persons who are strangers to transactions as to which the negligence may occur.

In *U. S.* v. *Kirkpatrick*, 9 Wheat. 720, the supreme court say:

"The general principle is that laches is not imputable to the government. The utmost vigilance would not save the public from the most serious losses if the doctrine of laches could be applied to its transactions. It would, in effect, work a repeal of all its securities."

In *U. S.* v. *Vanzandt*, 11 Wheat. 190, the court say:

"The neglect in the one case and the other imputes laches to the officer whose duty it was to perform the acts which the law required; but, in a legal point of view, the rights of the government cannot be affected by these laches."

"A claim of the United States is not released by the laches of the officer to whom the assertion of that claim was intrusted." *Dox* v. *Postmaster General*, 1 Pet. 325. "Statutes of limitation do not bind the United States unless it is specially named therein." *Lindsey* v. *Lessee of Miller*, 6 Pet. 666; *U. S.* v. *Hoar*, 2 Mason, 311. "The unauthorized act of the officer of the United States (in the matter of a claim for or against it) cannot bind the United States." *Filor* v. *U. S.* 9 Wall. 49.

If, indeed, there could be any rational doubt entertained in regard to the reason why not more than 1,500 shares of the canal stock were delivered in 1837, or any reasonable pretension that such delivery was, in fact, accepted by the United States as completing the obligation of Alexandria, and if this doubt could not be cleared up because of the death of witnesses who were cognizant of the transaction, and loss of evidence touching it, this court, as a court of equity, might hesitate to enforce the specific performance of a contract thus rendered obscure by a long lapse of time. But, as already said, I do not think there can be any reasonable doubt of the facts of the original transaction, or of the intention of congress or of Alexandria in entering into it. Where an obligation is clear, equity will not refuse to enforce it because of mere lapse of time since its origin. True, in cases where the rights of third persons have become involved, equity will often refuse to enforce a long-standing obligation to the injury or prejudice of such persons. So, where the terms or nature of a long-standing obligation have become uncertain, in consequence of the lapse of time, the loss of evidence, or the death of witnesses, equity will sometimes refuse to enforce it in consequence of this uncertainty; it will not make a decree, apparently just, where there is danger, in making it, of doing real injustice. Such are some of the considerations on which equity will refuse to enforce an old obligation. But where the obligation is clear, and its essential character has not been affected by the lapse of time, equity will enforce a claim of long standing as readily as one of recent origin; certainly as between the immediate parties to the transaction. See the case of *Etting* v. *Marx*, 4 Hughes, 312, S. C. 4 FED. REP. 673, where the doctrine of limitations in equity is very elaborately discussed as to suits between private individuals.

But the parties to the present transaction are, on one side, a government of permanent stability, and on the other, a municipal corporation older than the government. They are not like natural persons, whose relations and obligations are all more or less affected by mere lapse of time. The reason which induces equity to look with disfavor upon old and stale claims, as between natural persons, ceases when applied to governments and public corporations. Forty years in the life of such bodies are but as so many days or months in the life-time of individuals. Obligations between them are just as enduring. I must hold that, as between the United States and Alexandria, time has not released the city from the obligation to deliver

to the secretary of the treasury the 3,500 shares which she had in March, 1837.

It cannot be necessary to answer at length the wholly untenable pretension that the corporation of Alexandria, when it delivered the certificates for 1,500 shares, was absolved from further obligation because it did not own the remaining 2,000 shares; for it is a familiar doctrine that if one undertakes to grant property not yet in his possession or paid for, but which he subsequently does acquire and pay for, the title inures to his first grantee.

It is no objection to a decree being made for specific performance of a part of a contract when the performance of the remainder has been made impossible by the act of the defendant. To permit such an objection to prevail would be to violate the maxim that no man shall take advantage of his own wrong. See Fry, Spec. Perf. § 294, citing Lord ELDON, who, in speaking of one who had undertaken to convey a greater interest than he possessed, says:

"For the purpose of this jurisdiction, the person contracting under these circumstances is bound by the assertion in his contract, and if the vendee chooses to take as much as he can have, he has a right to that, * * * and the court will not hear the objection, by the vendor, that the purchaser cannot have the whole."

See, also, *Morss* v. *Elmendorf,* 11 Paige, 287; *Hatch* v. *Cobb,* 4 Johns. Ch. 559; *Kempshall* v. *Stone,* 5 Johns. Ch. 193; Fry, Spec. Perf. §§ 554, 258.

The latter is to this point, that where a hardship has been brought upon the defendant by himself, it shall not be allowed to furnish any defense against the specific performance of the contract, at least whenever the thing he has contracted to do is reasonably possible.

In *Bennett* v. *Abrams,* 41 Barb. 619, it is said, where specific performance of a contract is impossible, the plaintiff may have approximate relief in some other form which will secure him the substantial advantage of the agreement.

The state of Virginia is not a party to this suit, and could not be required to return any part of the 2,720 shares which she obtained' from Alexandria if she were. It is not shown that she was made cognizant of the fact that Alexandria had not an equitable right to deliver to her as many of the shares of the canal company as she did deliver. The evidence does not show that this fact was brought home to the mind of the Virginia legislature when that body passed the act authorizing the exchange of state bonds for these shares, though it does show that Alexandria, in the person of her agents, was informed that she was violating her obligations to the United States in soliciting and making that exchange.

As to the damages claimed by the bill against the city, from the non-delivery of the 2,000 shares to which the United States are still entitled, I do not think it would be equitable for this court to do more than require these missing shares to be delivered. It was not intended

by the United States, in the act of March 3, 1837, to create a money demand directly or indirectly against the city, and I am not disposed to make a money decree against the city. I do not think the measure of damages in this particular case is the highest price which the shares of the canal company have commanded in the market since the delinquency, as contended by counsel for plaintiffs. What steps should be taken in this suit to enforce the full performance of the obligation of the city must be hereafter determined. I will at once make a decree requiring the city to transfer to the secretary of the treasury the 780 shares still held by her, and to make up the remainder of the 2,000 shares yet due.

See *U. S.* v. *Southern Colorado Coal & Town Co.* 18 FED. REP. 273; *U. S.* v. *Beebee,* 17 FED. REP. 36.