OPINION.
Scofield, J.,
delivered the opinion of the court:
The statement of a very few facts will be sufficient to exhibit all the points in dispute.
In October, 1861, the defendants, by such contract as is presented in the second finding of facts, rented from the claimants’ testator, for use as a military hospital, the Mansion House, in Alexandria, Va., and agreed to pay therefor $750 a month. They took possession under the lease and occupied the premises *104 from November 11, 1861, to June 30, 1865. The rent, amounting in all to $32,750, lias never been paid. Claimants’ testator, in March, 1864-, made formal application to the War Department for payment of the rent, and before and after the surrender of the premises continued to press his claim. The claim was finally referred by the War Department to the accounting officers of the Treasury Department, where it remained until May 10, 1882, when, under the provision of section 1063 of the Devised Statutes, it was transmitted by the Secretary of the Treasury to this court for trial and adjudication.
Here it encounters several objections.
First. Iv is said the Court of Claims cannot take cognizance of it, both because it does not come within its original jurisdiction as restricted by the first section of the Act of July 4, 1864, and because the Treasury Department, under the second and third sections of said Act of July 4, 1864, ch. 240, and the Act of February 21, 1867, ch. 57, had no authority to entertain it. (13 Stat. L., 381, and 14 Stat. L., 57.)
In considering this objection, we assume for the present that the lease or contract set out in the second finding of facts is valid and binding upon the Government.
It is conceded that no claim transmitted by a Department can be entertained by this court unless it comes within its jurisdiction, otherwise conferred, nor unless the Department by which it is transmitted could itself legally consider and decide it.
It ¡is not denied that this court has general jurisdiction of claims founded upon contract, but it is supposed that this particular claim is taken out of that general jurisdiction by the first section of the Act of July 4, 1864 (13 Stat. L., 381), which is as follows:
The jurisdiction of the Court of Claims shall not extend to or include any claim against t-lie United States growing out of the destruction or appropriation of or damage to property by the Army or Navy, or any part of the Arm.y or Navy, engaged in the suppression of the rebellion, from the commencement to the close thereof.
It is not easy to see how claims founded upon express contracts made by a Department, and agreeing to pay specific sums of money, can be classed with unliquidated claims for “ destruction, appropriation, or damage to property by the Army or Navy,” and so brought under the ban of this act. A contract presupposes action and agreement of two parties, but “destruction, *105 appropriation, and damage” imply action by one party only and dissent by another. In the Filor Oase (9 Wall., 45, and 7 C. Cls. R., 119) Justice Field, speaking for the court, says :
If tlie right to the property or its use is not obtained by valid contract with the Government, the tailing or use of it is an appropriation within the meaning of the act of Congress. The learned counsel of the petitioners is correct in stating that leasing and appropriation are different acts.
Assuming as above stated that tbe lease is valid, we come to the conclusion that this claim is not withdrawn from the juris■diction of the court by the first section of the Act of July 4, 1864.
Does it also come within the jurisdiction of the Treasury Department1?
It is not denied that, prior to the Act of July 4, 1864, the Secretary and accounting officers of the Treasury had power to •examine, audit, and pay from any proper appropriation claims .against the Government, liquidated iu amount and based upon valid contracts. The second and third sections of the Act of 1864 was passed, not to diminish but to enlarge the powers of these officers. The second section is as follows:
All claims of loyal citizens in States not iu rebellion for quartermaster’s ■stores actually furnished to the Army of the United States, and receipted for by the proper officer receiving the same, or which may have been taken by such officers without giving such receipt, may be submitted to the Quartermaster-General of the United States, accompanied with such proofs .as each claimant can present of the facts in his case; and it shall he the duty of thq Quartermaster-General to cause such claim to he examined, and if convinced that it is just, and of the loyalty of the claimant, and that the •stores have been actually received or taken for the use of and used by said Army, then to report each oase to the Third Auditor of the Treasury, with a recommendation for settlement.
The third section confers similar power upon the Commissary - ■General. The Act of February 21, 1867, only circumscribes .and restrains the power specially conferred by this Act ot 1864. It is as follows:
' • The provisions of chapter two hundred and forty, of the aots of the Thirty-eighth Congress, first session, approved July fourth, eighteen hundred, and •sixty-four, shall not be construed to authorize the settlement of any claim for supplies or stores taken or furnished for the use of, or used by, the armies of the United States, nor for the occupation of, or injury to, real .estate,norfortheconsumption, appropriation, or destruction of, or damage to, personal property by the military authorities or troops of the United States, where such claim originated during the war for the suppression of the South•ern rebellion, in a Statg or part of a State declared in insurrection by the proc *106 lamation of the President of the United States, dated July first, eighteen hundred and sixty-two, or in a State which by an ordinance of secession attempted to withdraw from the United States Government.
It will be seen that these two acts do not withdraw, diminish,, or in any way affect the authority possessed by the Departments prior to 1864 to settle contract debts of the- Government. It-cannot be claimed that- this act prohibits the settlement of a claim for the occupation of real estate by the military authorities, where such claim originated during the war in an insur-rectionary or seceding State, unless the power to settle the-same was derived from the Act of 1864. As the power to settle contract claims was not conferred by the act of 1864, it was not taken away by the Act of February 21, 1867. This claim,, it should always be borne in mind, is not for use and occupation of real estate, but for a specific sum of money alleged to be due upon an expressed contract. To be sure, the consideration of the contract was the right to occupy real estate, but taking and holding by contract excludes the idea of military occupation within the meaning of the Act of 1867.
This view of the law is sustained byAttorney;GeneralEvarts in Rollings' Case (12 Opin., 439).
There is nothing in the letter, spirit, or apparent purpose of the Act of 1867 which would absolve the Government from the payment of its contract debts, or deprive citizens of remedies therefor theretofore enjoyed.
Second. The defendants claim that the judgment of dismissal, as set out in the fifth finding of facts, is, under section 1093 of' the Eevised Statutes, a bar to recovery here. That section reads as follows:
Sec. 1093. Any final judgment against the claimant on anjr claim prosecuted as provided in this chapter shall forever bar any further claim or demand, against the United States arising out of the matters involved in the controversy.
It will be remembered that this court is forbidden to take jurisdiction of a claim more than six years old, and the court having found as a fact that the claim in that case was more than six years old dismissed it for want of jurisdiction.
Was this a u final judgment on the claim” V
The claimants come to the threshold of the court and crave a hearing They are informed that the court is forbidden by the statute of limitations to listen to their prajrnr. They are *107 turned away. This is not an adjudication of tbeir claim, but a refusal to hear it. Certainly this should not deprive them of a hearing before a tribunal otherwise authorized to entertaiu their petition. (Hughes's Case, 4 Wall., 232; Spicer’s Case, 5 C. Cls. R., 34.)
•Besides, an appeal from this judgment has been taken, and is still pending; and for this reason also the judgment is not final.
The case, as it now comes to us through the Treasury Department, does not encounter the statute of limitations, at least not in the same way nor to the same extent. It is claimed to have been presented to the Department within six years after it accrued, and, if so, it is not affected by the statute. The proceeding here is held to be a continuation of the proceedings in the Department, and, if begun there in time, it can be heard here now. (Lippitt’s Case, 100 U. S. R., 663.) It appears by the findings that application for the payment of accrued rent was made to the Quartermaster-G-eneral as early as March 17, 1804; and that shortly after the close of the war, and at various times thereafter, the pending application for payment was followed, in furtherance of the claim, by applications for papers showing the authority from the War Department to make the contract. In 1872 a second application for payment was made to the Secretary of War. From the War Department the claim was sent before the accounting officers of the Treasury Department, where it had been pending, until transmitted to the Court of Claims, May 10,1882. From these facts we hold that the claim was presented to the Department within six years from the time it accrued, and is not, therefore, barred by the statute.
But even if the claim had not been presented to the Department 'within six years after it had accrued, it is not at all clear that that fact would deprive this court of jurisdiction. No court, so far as we know, has so decided, and the statutes are certainly susceptible of a more liberal construction. The general question has been often raised in this court, but in no case in which the facts required a decision specifically upon this point. And in the discussion of the general questiou in these opinions, no distinction is made between claims presented to the Department before and those presented after the six years *108 have expired. (Winnisimmet & Co.’s Case, 12 C. Cls. R., 319; Lippitt’s Case, 14 C. Cls. R., 148). The question is not passed upon by the Supreme Court in Lippitt’s Case (100 U. S. R., 663), as has been stated. In that ease Justice Harlan, delivering the opinion of the court, says:
Whether if a elaim he presented at the proper Department, when six years have elapsed after it first accrued, the Government is at liberty, upon its transfer therefrom to the Court of Claims, to plead the limitation of six years, or whether the court in such cases must itself interpose the statute for the protection of the Government, are questions not necessary to be decided in this case.
The only remaining question tobe considered is, whether the property was held under a valid contract with the Government or by military occupation only. If by military occupation only, it is conceded that the power to settle the claim was withheld from the Department by the Act of February 21,1867, and having no jurisdiction itself, it could transfer none to us.
Was there a valid contract?
October 28, 1861, the Surgeon-General, by direction of the Secretary of War, went to Alexandria to select a place for a military hospital. October 30, 1861, he reported to the Secretary as follows:
In obedience to instructions, I proceeded to Alexandria, and, after a careful examination, have selected the Mansion House in that city, from its commodious and. enlarged accommodations, its perfect ventilation and proximity to the railroad, as the host adapted site for an hospital for the wounded and sick soldiers. It will accommodate about one thousand patients, is well supplied with gas and water, and does not require as many medical officers and appliauoes as smaller and more isolated buildings would render necessary.
October 31, 1861, the action of the Surgeon-General was approved by the Secretary of War, and November 1, 1861, it was referred by the Surgeon-General to- the Quartermaster-General, “with a request that the building within named be obtained and turned over to this (the Surgeon-General’s) Department for hospital purposes as soon as practicable.” November 5, 1861, this report, approval, and request was referred by the Quartermaster-General to Colonel Ingalls, assistant quartermaster, with headquarters at Arlington, with instructions to “take measures to rent the Mansion House, at Alexandria, and put it in proper condition for hospital purposes.” November 8, 1861, Colonel Ingalls directed his sub *109 ordinate officer, Lieutenant Furguson, acting assistant quartermaster, stationed at Alexandria, ■ to “ take measures to procure and place this building at the disposal of the Medical Department at the earliest moment possible, in the manner indicated that is, by renting it in obedience to the order of the Qnartermaster-General. November 24, 1861, Lieutenant Fur-guson reported that he had “ rented the Mansion House, and transferred it November 11,1861, to Assistant Surgeon Shelden, at a monthly rental of $750.”
It will be observed that the authority to select a place for the hospital was derived directly from the Secretary of War, and the authority to rent the Mansion. House after it had been selected came from the Quartermaster-General. He gave the order to rent, and left the price to the discretion of his subordinates. The premises were rented by his officers and order. The terms were duly reported to him, and the report was finally retained, and filed, without official dissent. Possession was taken in pursuance of the lease, and thereafter the monthly report to the Quartermaster-General by the officer in charge stated the amount of rent falling du'é upon it from month to. month.
In the Filor Case (9 Wall., 45) the facts are widely different. In that case the lease was made by a subordinate officer without any authority or pretended authority whatever. It was made, too, after the officer in command had given an brder for the seizure and occupancy of the premises. That lease was neither authorized by the Quartermaster-General in advance nor approved by him afterwards. On the contrary, some years after, but during the occupancy of the premises, it was expressly disapproved by him. .“The agreement or lease,” says Justice Field, “was, so far as the Government is concerned,, the work of strangers.” In the case at bar, it will be observed, the Quartermaster-General not only authorized but commanded his subordinate officer to rent the premises.
' But it is objected that the lease was not expressly affirmed by the Quartermaster-General. Did its validity depend upon such express affirmation? Is not a contract made through a. subordinate officer, by an express written order of the Quartermaster-General, a contract made by himself? We think it should be so regarded, unless, after officially learning how his order had been executed, he disapproved it. In such a case- *110 non-action should be held as affirmance. There is nothing in this case to indicate disapproval. His letter to Colonel In galls, in which he expresses the opinion that the rent is extravagant, and inquires about the loyalty of the lessor, amounts only to a consultation with his own officers upon the subject. It was not brought to the attention of the lessor. If any presumption is to be drawn from this correspondence it is in favor of the validity of the lease, for it shows that after his attention had been particularly drawn to the subject, and after inquiry, consultation, and consideration, he left on the records of the Department no sign of disapproval.
Upon the trial it was not proved nor even alleged that the rent was in fact extravagant. In the absence of all evidence the court cannot presume that $9,000 a year for a hotel in the city of Alexandria, “with commodious and enlarged accommodations, perfect ventilation, well supplied with water and gas, and capable of accommodating one thousand patients,” was at that time an extravagant rent. It is quite probable that the Quartermaster-General, after his consultation with Colonel Ingalls, came to that conclusion, and for that reason did not disapprove of the report of his subordinate.
It is further said that the disaffirmance of the lease can be presumed from the refusal to pay the rent. But no presumption of that kind can arise, since another reason was distinctly given at the time. When the lessor called upon the assistant quartermaster for his rent he was required, as a condition precedent to payment, to take .the oath of allegiance. He declined, and, for this reason and no other, payment was refused. When, in March, 1804, he requested payment at the Quartermaster-General’s Office, he was informed by letter, signed by Quartermaster-General Meigs, that he had “not been paid because he was believed to be disloyal to the United States, and had refused to take the oath of allegiance.” There is no intimation that the lease was regarded as invalid. However prudent and justifiable this requirement of General Meigs might have been at the time, a failure to comply with it is not now urged as a defense. The reason for the refusal to take the oath does not appear in the findings, but it is stated in the argument by counsel for the Government that he owned property in the Confederate States and was afraid of confiscation. At all *111 •events, in May, 1865, after the danger was over, he took the required oath.
But if it should be held that a lease made under an express written order of the Quartermaster-General required his subsequent approval, could not such approval, as in the Case of Speed (8 Wall., 77, and 7 C. Cls. R., 93), be presumed from the facts stated? In Speed’s Case, although the contract made by a subordinate officer and by its own terms was void unless approved by the Commissary-General, and although it was never expressly approved by him nor even reported to him for that purpose, yet, from facts no more convincing than those appearing in the findings here, his approval was presumed.
The judgment of the court is that the claimants recover from the defendants the sum of $32,750.