AMERICAN MAIL LINE, LIMITED, v. UNITED STATES.

No. 45441.

Court of Claims.

April 2, 1945.

John Ambler, of Seattle, Wash. (Gross-
cup, Morrow & Ambler, of Seattle, Wash.,
on the brief), for plaintiff.

Allan B. Lutz, of Washington, D. C., and Francis M. Shea, Asst. Atty. Gen. (J. Frank Staley and Irving R. Storch, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and WHITAKER, MADDEN, LITTLETON, and JONES, Judges.

WHITAKER, Judge.

Plaintiff sues to recover the cost of transporting 145 seamen from Hong Kong, China to San Francisco, California, and for the cost of transporting 11 seamen from Manila, Philippine Islands to San Francisco, California. These seamen were a part of the crew of the President Hoover when it was shipwrecked December 10 or 11, 1937, at Kashoto (Hoishoto) Island, a small island approximately 18 miles off the east coast of Formosa. The President Hoover belonged to the Dollar Steamship Lines, Inc., Ltd., whose name was later changed to the American President Lines, Ltd. The steamship President McKinley, on which the seamen were transported to San Francisco, belonged to plaintiff, American Mail Line, Ltd., which was an affiliate of the Dollar Steamship Lines, Inc.

Plaintiff's right to recover is based upon 46 U.S.C.A. §§ 593, 678, 679, which read as follows:

46 U.S.C.A. § 593, provided as follows:

"In cases where the service of any seaman terminates before the period contemplated in the agreement, by reason of the loss or wreck of the vessel, such seaman shall be entitled to wages for the time of service prior to such termination, but not for any further period. Such seaman shall be considered as a destitute seaman and shall be treated and transported to port of shipment as provided in sections 678, 679, and 681 of this title. This section shall apply to fishing and whaling vessels but not to yachts."

46 U.S.C.A. § 678:

"It shall be the duty of the consuls and vice consuls, from time to time, to provide for the seamen of the United States, who may be found destitute within their districts, respectively, sufficient subsistence and passages to some port in the United States, in the most reasonable manner, at the expense of the United States, subject to such instructions as the Secretary of State shall give. The seamen shall, if able, be bound to do duty on board the vessels in which they may be transported, according to their several abilities."

46 U.S.C.A. § 679:

"All masters * * * are required to take such destitute seamen on board their vessels, at the request of consular officers, and to transport them to the port in the United States to which such vessel may be bound * * * and the amount agreed upon between the consular officer and the master of the vessel in each individual case not in excess of the lowest passenger rate of such vessel and not in excess of 2 cents per mile shall in each case constitute the lawful rate for transportation on steam vessels; and said consular officer shall issue certificates for such transportation, which certificates shall be assignable for collection. * * *

"Reasonable compensation, in addition to the allowances provided herein, or any allowance now fixed by law, or by regulations * * * may be paid from general appropriations for the relief and protection of American seamen, when authorized by the Secretary of State, in the following cases: * * *

"Second. Whenever distressed or destitute seamen of the United States are transported from foreign ports where there is no consular officer of the United States, or from points on the high seas, to ports of the United States, or from such foreign ports or points on the high seas to a port accessible to a consular officer of the United States who is authorized to assume responsibility on behalf of the Government of the United States for the further relief and repatriation of such seamen, there shall be allowed to the master or owner of each vessel in which they are transported such reasonable compensation as shall be deemed equitable by the Secretary of State."

When the President Hoover was wrecked the steamship President McKinley, owned by plaintiff, was diverted from her course and directed to proceed to the wreck. She took on board and transported to Manila, Philippine Islands, 15 members of the crew of the wrecked vessel. The following day the steamship President Pierce, owned by the Dollar Steamship Lines, which also had been diverted from her course and sent to the wreck, took on board 174 members of the crew and some passengers and transported them to Honk Kong.

There was no Consul on the Island of Kashoto, nor one closer than Taihoku on

the Island of Formosa, about 200 miles from Kashoto. This place was not on the regular run of either the President Pierce or the President McKinley, and so the seamen were taken to Manila, Philippine Islands, and Hong Kong, China. These cities were about equally distant from Kashoto.

The President McKinley arrived at Manila on December 15 and left the next day, having aboard 11 of the 15 members of the crew of the President Hoover which she had brought from Kashoto. These were transported by way of Hong Kong, and Kobe and Yokohama, Japan to San Francisco. This was her regular route.

Upon arrival in Manila neither the master of the President McKinley nor any agent of plaintiff contacted the Consul relative to the repatriation of the shipwrecked seamen on board, but after the voyage had been completed the Consul at Manila executed a certificate in which he stated that the President McKinley had brought to Manila the 15 seamen from Hoishoto Island, and had transported them from Manila to San Francisco, and that upon presentation of that certificate duly endorsed by the collector of customs at San Francisco, certifying to the arrival of the seamen, the master of the President McKinley was entitled to receive "such compensation, if any, as may be allowed by the Comptroller General of the United States." The certificate further testified to the distance traversed from Manila to San Francisco and that the lowest passenger rate on the President McKinley was $138.46.

Prior to the arrival of the President McKinley at Hong Kong the Robert Dollar Company, which was the general agent at Hong Kong for both the Dollar Steamship Lines and the American Mail Line, wrote the Consul General at Hong Kong, advising him of the arrival of the President Pierce with some of the shipwrecked crew of the President Hoover, and calling upon him to take care of them as distressed seamen. The Consul declined to do so, saying: "As the Dollar Company, owners of the S. S. President Hoover, have taken up the 'Burden of subsisting and transporting the members of the crew' of the S. S. President Hoover, and as I understand that arrangements exist for their repatriation within two or three days from Hong Kong to the United States on the S. S. President McKinley, another vessel owned and operated by the Dollar Company, it does not seem to me that under the above quoted Regulation this office is authorized to expend 'public funds' in taking care of these 176 men."

Upon receipt of this letter the Robert Dollar Company wrote the Consul General in part as follows: "I have to acknowledge receipt of your letter of December 17, and in consideration of the views expressed therein, I wish to inform you that we are making arrangements to provide board and lodging for these men in Hong Kong, and will arrange to repatriate them to the United States by the S. S. President McKinley, sailing on December 20."

He stated, however, that this was being done "without prejudice to any claims which might later be made under benefit of any laws which may be applicable to this case."

Further correspondence ensued between the Robert Dollar Company and the Consul General, but neither the Consul General nor the State Department in Washington would assume responsibility for the cost of transporting these seamen from Hong Kong to San Francisco, and when the formal claim finally reached the Comptroller General he disallowed it except for the cost of transporting the 15 seamen from Hoishoto Island to Manila.

Plaintiff sues for $20,134.70, the cost of transporting 145 seamen from Hong Kong to San Francisco, and $1,523.06 for transporting 11 seamen from Manila, Philippine Islands, to San Francisco, all at the lowest passenger rate, which was less than a charge of two cents per mile.

There can be no doubt that the obligation was on the United States to repatriate these seamen. 46 U.S.C.A. § 593, expressly provided that a seaman whose service has been terminated by the wreck of a vessel upon which he was serving, "shall be considered as a destitute seaman and shall be treated and transported to port of shipment as provided in sections 678, 679, and 681." Section 678 unequivocally makes it "the duty of the consuls and vice consuls, from time to time, to provide for the seamen of the United States, who may be found destitute within their districts, respectively, sufficient subsistence and passages to some port in the United States, in the most reasonable manner, at the expense of the United States, subject to such instructions as the Secretary of State shall give."

The Comptroller General, however, read into this Act a duty on the part of the owner of a shipwrecked vessel to repatriate shipwrecked seamen if it had other vessels available for this purpose, and it was because of these rulings that the State Department refused to repatriate the crew of the President Hoover. The Supreme Court, however, in Alaska Steamship Co. v. United States, 290 U.S. 256, 264, 54 S. Ct. 159, 161, 78 L.Ed. 302, held that there was no such duty on the part of a steamship company, but that the obligation of the United States to repatriate the seamen was unequivocal. The court said: "The statutes terminate seamen's right to wages with the termination of their service by the shipwreck, and without qualification impose on the government the obligation to transport them. It cannot be supposed that the performance of this obligation which since the early days of the government has been treated by Congress as a public duty, was intended to be conditional upon the ability of seamen, left destitute in a distant land, to induce the shipowner to transport them in performance of a supposed duty which the statute neither imposes nor mentions."

This decision was rendered in 1933. In the following Appropriation Act for the fiscal year ending June 30, 1935 (48 Stat. 529, 533), there was inserted a proviso reading as follows: "That no part of this or any other appropriation shall be available for making payment to steamship owners or operators for transporting a destitute or shipwrecked seaman if the last previous service of the destitute or shipwrecked seaman was on a vessel of such steamship owner or operator and was not terminated by desertion."

Probably because of this provision of the Appropriation Act, the State Department regulations have continued, notwithstanding the Alaska Steamship Co. decision, to provide for repatriation by the consuls only in cases where the company whose vessel had been wrecked had no other vessel available to repatriate them. However, this provision of the Appropriation Act of 1935 has never been reenacted and was not the law when the President Hoover was shipwrecked and its crew were transported

to the United States by the President McKinley.[2] The law then was that set out in sections 593, 678 and 679 of 46 U.S.C. supra, as interpreted by the Supreme Court in the Alaska Steamship Co. case.

The defendant now admits that it was the unqualified duty of the United States to pay for the cost of the repatriation of these seamen, but it says that plaintiff cannot recover because there was no contract between it and the Consul General at Hong Kong or at Manila for their transportation. Insofar as the 145 seamen transported from Hong Kong to San Francisco are concerned, this is true; there was no contract for their transportation. The Consul refused to make a contract, relying upon the erroneous regulations of the State Department; but he did call upon the Dollar Line to provide for their transportation.

The duty for caring for these men having been thus repudiated by the defendant and the burden for doing so having been cast on the Dollar Steamship Company, that company, under protest and without acknowledging liability for caring for them, arranged with plaintiff to carry them back to the United States. Plaintiff performed the service requested of it and is entitled to look for payment to that person upon whom the law lays the burden of providing the service. That person is the defendant.

When plaintiff demands payment, defendant of course cannot be heard to say that it is not liable because it refused to enter into that contract which the law made it its duty to execute. It cannot take advantage of its own wrong. United States v. Peck, 102 U.S. 64, 26 L.Ed. 64; Stearns Co. v. United States, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647. Williston on Contracts (Rev. Ed. 1936), section 794.

Nor can plaintiff be considered a mere volunteer. It rendered the service at the request of the person to whom defendant had sought to shift the burden of providing it. Defendant had abandoned these destitute seamen. Anyone, we take it, who in such circumstances performed the duty the defendant owed them would be entitled to remuneration therefor, in analogy to a per-

---

[2] In its correspondence with the Consul General at Hong Kong the State Department advised him that this provision of the Appropriation Act was no longer effective. Defendant in its brief admits this provision was not repeated in subsequent Appropriation Acts and that it had been construed as temporary legislation, citing 18 Comp.Gen. 37, and it does not rely on it.

934

son's right to collect from the father the cost of necessaries furnished an abandoned child. But plaintiff's case is stronger than that. It furnished the service at the request of him upon whom the defendant had undertaken to cast the responsibility of caring for its wards.

The seamen had the right under the law to be taken back to their homes at the expense of the United States. The United States owed them this obligation. Where the obligation is repudiated and another is compelled to discharge it, at defendant's indirect request, that person is subrogated to the seamen's rights to collect the cost from the defendant, who owed the duty. Cf. United States v. American Tobacco Co., 166 U.S. 468, 17 S.Ct. 619, 41 L.Ed. 1081; Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Nashville Industrial Corporation v. United States, 69 Ct.Cl. 443; Maryland Casualty Co. v. United States, 32 F.Supp. 746, 91 Ct. Cl. 203.

Plaintiff's right to collect for the transportation of the seamen from Manila seems plain. No contract was entered into in advance of the rendition of the service, but afterwards the agent of the defendant who was authorized to enter into the contract ratified what had been done and issued a certificate that complies in all essential respects with that required by the law and the regulations, except that it certifies plaintiff is entitled to receive "such compensation, if any, as may be allowed by the Comptroller General of the United States * * *." The Consul should have agreed upon and have stated the compensation to be paid; he did not do so because of a regulation of the State Department requiring him to use the expression he did use in a case where the rulings of the Comptroller General left in doubt the liability of the United States to render the service. Art. XVI, sec. 282, note 1, sub. (6). However, he did certify to the lowest passenger rate, and that is the rate, being less than two cents a mile, which plaintiff is entitled to receive under the laws and regulations. Art. XVI, sec. 282, note 1 (6) of the Consular Regulations provides: "* * * If masters demand the regular steerage-passage rate not to exceed two cents per mile, they cannot be required to carry the seamen for less. * * *"

Defendant does not contest the correctness of the amount claimed, if plaintiff is entitled to recover at all. That sum is $21,657.76. Judgment against the defendant in favor of plaintiff for this amount will be rendered. It is so ordered.

MADDEN and LITTLETON, Judges, and WHALEY, Chief Justice, concur.

JONES, Judge, took no part in the decision of this case.