## BUFFALO & FORT ERIE PUBLIC BRIDGE AUTHORITY v. UNITED STATES.

No. 45744.

Court of Claims.

May 6, 1946.

Harry J. Gerrity, of Washington, D. C., for plaintiff.

Percy M. Cox, of Washington, D. C., and John F. Sonnet, Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

Plaintiff is successor to the Buffalo and Fort Erie Public Bridge Company which constructed and opened to traffic in June 1927 an international toll bridge, known as the Peace Bridge, across the Niagara River between Buffalo, New York, and Fort Erie, Ontario. Plaintiff assumed possession and management of all properties of the Buffalo and Fort Erie Bridge Company and received conveyance of all the latter's personal and real assets in May 1934. For the purposes of this proceeding the separate ownership and operation of the bridge and its adjacent buildings by the two separate legal entities is a purely formal one. In the determination of the issues the operation of the properties may be treated as a continuous one in plaintiff from the beginning of construction of the bridge until the filing of the present claim.

Plaintiff brought suit September 1, 1942, to recover the amount of $92,500, representing $15,425 per annum for the six years immediately preceding the filing of its petition herein, as the fair and reasonable value for the continued use and occupancy by defendant during such period of the space and facilities furnished by plaintiff during said six years to the Customs and the Immigration Services of the United States Government in the buildings owned by plaintiff located at the American approach to the Peace Bridge, in the city of Buffalo, New York. In the briefs plaintiff asks judgment for $60,000 at a fair use or rental value of $10,000 a year from September 1, 1936 to August 31, 1942.

The space and facilities used by the two Services at the Peace Bridge are comprised principally of office space in the Terminal Building at the end of the bridge, along with the necessary heat, electricity, water, window washing, janitor's service and sup-

plies, and the use of certain furniture and equipment, all of which were provided by plaintiff. In addition to such space and facilities the Customs Service also had exclusive occupancy of a separate warehouse and the benefit of daily cleaning of same in excess of ordinary janitor service, required by the use in which it was employed by defendant.

Plaintiff predicates its right to recover in this court upon (1) an implied contract on the part of the Government to pay plaintiff reasonable compensation by way of rental for the space and facilities furnished to and used by the two Services; (2) the annual Appropriation Acts of Congress for the six years involved in this suit providing lump sum appropriations by Congress for the general maintenance and operation of the two Services, including rent of buildings occupied by the two Services, viewed in pari materia with the act of Congress of June 26, 1930, chap. 617, sec. 1, 46 Stat. 817, 19 U.S.C.A. § 68, the two together constituting an authorization and expression of intent that the Treasury and the Labor Departments should pay the fair and reasonable value of the space occupied by the Customs Service and the Immigration Service, respectively, at points along the Canadian and Mexican borders where no Federal buildings were available, and where buildings adapted or suitably located for the enforcement of the customs and immigrations laws were available for rental.

The findings show that during the period involved in this claim budget estimates specifying sums for rental of space generally for the use of the Immigration and Customs Services, respectively, were presented biennially to Congress, such specified sums being sufficiently large to have included, as to each service, payment of such an amount of rent at yearly rental values for the quarters and services here involved, as set forth in finding 11, which we have found to be reasonable, and that during such period Congress annually provided lump sum appropriations to cover such estimates.

It is contended by defendant, first, that there was never any meeting of minds between the parties on the question of payment of rent, and hence there was no im-

plied contract upon which plaintiff can recover; and, second, that the right to control the expenditures of a lump sum appropriation is discretionary with the administrative officer in the absence of a mandatory direction by Congress to the contrary, and no such direction was present in the appropriation acts compelling the two Services to enter into a rental arrangement with plaintiff.

The two Services have occupied the buildings and have enjoyed the use of the facilities in question, since the opening of the Peace Bridge in 1927, at all times with the consent of plaintiff, subject to its express demand for rental in and subsequent to July 1938. No lease or agreement in writing was ever entered into for such occupancy. During all such time no rent or other monetary compensation was ever paid on behalf of either of the Services for such use. No express promise was ever made, by any representative of either of the two Services qualified to bind the Government thereby, that rent would be paid. On the other hand no promise was ever made by plaintiff or its predecessor to furnish the buildings or facilities rent free. Under these circumstances it is our duty to determine whether there may be fairly implied in the facts of the case an obligation or undertaking to compensate plaintiff for the use of its property.

It is obvious, from the evidence offered, that when the Peace Bridge was constructed and opened to traffic in 1927 no particular thought was given at that time to the matter of obtaining current rent for the use of the buildings and facilities constructed and made available for use of the Customs Service and the Immigration Service of the United States. The matter of rent was discussed earlier (findings 2 and 3), but not with any official having authority to bind the Government. It was taken for granted that the presence of customs and immigration officials would be necessary in the operation of the bridge. This is apparent in the fact that the Bridge Company's plans and drawings provided for buildings to house the two Services. And, knowing that the bridge could operate most effectively only through the presence of the proper officers of the two Serv-

ices, it was only natural that these plans and drawings should be submitted, as they were, to the local representatives of the Services for their approval. It was also natural for the Bridge Company to assume that these local officials might have suggestions to make as to how its plans might be changed to provide quarters more suitable for their operations. However these matters did not estop the Bridge Company or plaintiff from demanding reasonable rental for such facilities when the bridge was opened, or later. No requirement rested on the Bridge Company to provide the facilities as a condition to its right to build and operate the bridge.

The question of payment of rent by the Services came into these early discussions, but they were only in the way of preliminary discussion and were not, so far as appears from the evidence, intended by either of the parties to be definitive of their respective rights, or in the nature of a meeting of minds on the subject. The Bridge Company's primary thought at the time was to get the bridge into operation with adequate customs and immigration service available to attract the maximum volume of traffic to the bridge. The local officials of the two Services in Buffalo were equally interested in getting their respective governmental inspection services into operation with as little inconvenience and under as favorable working conditions as might be possible.

The testimony of one of plaintiff's witnesses that during these early conferences some discussion of rent took place and that local representatives of the two Services told the Company's representatives that there was no appropriation but, if and when there were such appropriations, the Company would be treated on the same basis as the owners of other international bridges is of no particular significance, if true. Such discussions did not purport to reach the stage of agreement. No officer below the Commissioners of Customs and of Immigration had authority to contract. There is no showing that these early discussions were had between persons who could have bound the respective parties by agreement. Viewed most favorably they fall short of being an official expression of the expectation on the part of the Bridge Company or of the intent on the part of the two Services regarding rent.

For approximately eleven years following the opening of the bridge plaintiff acquiesced in the occupation by the two Services of the buildings at the approach to the bridge, without any express demand for rental or other indication to responsible officials of the two Services that it expected that rent would be paid. It is equally true, however, that throughout this same time nothing was said or done by either party which can be construed as an express or implied representation or agreement that the Government's occupancy might continue indefinitely, or for any specific length of time, on this basis. So far as the state of mind of the respective parties during these eleven years can be determined from the evidence, the correspondence between the parties in 1938 indicates that plaintiff, in its own mind, had been providing the building space and facilities to the two Services up to that time "free of charge." As for the two Services, they appear to have been following their policy of long standing to not pay rent for quarters occupied at international bridges where none was demanded of them and, then, only when they were unable to convince the bridge owners that such quarters and facilities should be furnished free of charge, this notwithstanding their recognition of the fact that, under the existing conditions and laws, bridge companies were not legally obligated to furnish in the first instance or to continue to furnish quarters gratis.

In the absence of evidence from which we can imply a contrary understanding between the parties, we must conclude that plaintiff intended, during these eleven years, that which it admitted in its correspondence with the heads of the two services at a later date, August 2, 1938, namely, that the space and facilities furnished to the two Services had up to that time been furnished "free of charge." We are not unmindful of the fact that plaintiff may have been induced at the outset to proceed as it did by its belief that there was no available fund under an appropriation by Congress under which the Services could

obligate the Government to pay rent. Without considering at this point what the legal consequences might have been if the authorized administrative heads of the two Services had made such a statement to plaintiff, on which it had been induced to forego an insistence upon payment of rent at the time, it is sufficient to note that no such statements are attributed by plaintiff during this period of time to other than certain minor officials of the Services. The result remains, then, that during this period of time nothing was said or done between the parties upon which to imply a promise on the part of the Government to compensate plaintiff for the use of its premises. Harley v. United States, 198 U. S. 229, 25 S.Ct. 634, 49 L.Ed. 1029.

█ In July 1938, however, the picture definitely changed. At that time plaintiff brought to the official attention of the two Commissioners of the two Services the fact that it was no longer willing to furnish quarters and facilities for their use at the Peace Bridge free of charge, and demanded compensation by way of rental. Following several conferences in Washington between plaintiff's Treasurer-Manager and responsible and authorized officials of the Immigration and the Customs Services, to whom plaintiff had been directed, specific requests were addressed by letters under date of August 2, 1938, to the Assistant to the Commissioner of Immigration and to the Assistant Commissioner of Customs, outlining plaintiff's request and demand that rental be paid in the future for the premises and facilities furnished by plaintiff, stating plaintiff's reasons for its new position regarding the use of the premises and indicating what it considered would be a fair rental charge to the respective Services. From this date forward every act of plaintiff indicated to the two Services that plaintiff had no intention or expectation that the Services were to continue to enjoy the free use of the premises and the facilities furnished in connection therewith. Having stated that such had been furnished free of charge during the preceding eleven years, it was then unwilling to continue on such basis, but on the contrary, expected to be paid henceforth. the fair and reasonable value of such facilities and services. It thus becomes our duty to inquire whether from and after August 2, 1938, the inspection facilities were furnished by plaintiff to the two Services under such circumstances as would authorize plaintiff to entertain a reasonable expectation of payment by defendant and from which an obligation to pay may be implied. Coleman v. United States, 152 U.S. 96, 99, 14 S.Ct. 473, 38 L.Ed. 368.

The initial replies to plaintiff's letters of August 2, 1938, requesting payment of rent, were made on behalf of the Customs Service by letter of its Assistant Commissioner dated August 8, 1938, and on behalf of the Immigration Service by letter of The Deputy Commissioner of Labor dated August 16, 1938.

In responding to plaintiff's demand for payment of rent, the Services did not purport to contend for the right to remain in occupancy of the premises without charge on the basis of some right or title adverse to plaintiff, nor on the ground that under existing laws plaintiff was under legal obligation to furnish the quarters without charge. There was no denial of a legal obligation on the part of the Government under the facts and circumstances to pay for the continued use of plaintiff's property by the two Services, but merely a questioning of the equity and propriety of plaintiff's demand. No claim was made that plaintiff was required or had agreed to furnish the quarters free. The Immigration Service, in replying to plaintiff's demand for rent, states in part that "in the opinion of this office, the Bridge Company, operating as it does for revenue, should be willing to furnish quarters for the occupancy of Government officers without whose presence persons could not lawfully enter the United States over the structure," with the added statement that "in saying this we are not unmindful of the fact that bridge companies are not legally obligated to furnish such quarters gratis." The response of the Customs Service to plaintiff's demand was, in part, that "the Solicitor of the Treasury in an opinion dated February 1, 1922, with reference to the payment of rental for inspection quarters provided for the use of Customs' officers at the international bridge at Laredo,

Texas, held that the Congress in authorizing a private party to construct, maintain, and operate an international bridge had thereby granted such party a valuable concession and that therefore the claim for rental for space facilities necessary to the proper supervision of international traffic was inequitable and without merit." It appears, however, that the Solicitor of the Treasury, in this same opinion, added that "in my opinion, the United States cannot force the Laredo Bridge Company to furnish quarters necessary for the proper discharge of the Government functions in carrying out its Customs laws." In addressing himself to Congress some months later, with the view to securing legislation requiring bridge owners to furnish free inspectional quarters and facilities, the Acting Secretary of the Treasury conceded that "it has been the opinion of the Treasury Department that the operators of international toll bridges could not administratively be required to provide the Customs Service and Public Health Service of the Department with free inspectional facilities." As hereinafter stated, Congress refused to require Bridge Companies to furnish free quarters and necessary services therefor.

The substance of the argument advanced by the two Services as to why they should not pay rent to plaintiff comes down simply to this, that admitting plaintiff was under no legal obligation to furnish facilities necessary to enable the two Services properly to discharge their legal functions, the Government, nevertheless, should not be called upon or obligated to pay for the continued use of plaintiff's property even after knowledge of plaintiff's demand for and expectation of payment, because plaintiff's presence as a proprietor at the international crossing stemmed from the consent or an act of grace on the part of the United States Government. However, it was always admitted that the Government had established no such conditions to its consent. This concept of the relationship existing between the Government of the United States and its citizens was disaffirmed by the Supreme Court in James v. Campbell, 104 U.S. 356, 357, 26 L.Ed. 786, where Mr. Justice Bradley, in discussing the question as to whether the Government had a right to use, without compensation, an invention for which it had granted letters-patent, made the following observation:

"That the government of the United States when it grants letters-patent for a new invention or discovery in the arts, confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, *any more than it can appropriate or use without compensation land which has been patented to a private purchaser, we have no doubt* (Italics ours). * * * The United States has no such prerogative as that which is claimed by the sovereigns of England, by which it can reserve to itself, either expressly or by implication, a superior dominion and use in that which it grants by letters-patent to those who entitle themselves to such grants. The government of the United States, as well as the citizen, is subject to the Constitution; and when it grants a patent the grantee is entitled to it as a matter of right, and does not receive it, as was originally supposed to be the case in England, as a matter of grace and favor."

▮ It is our opinion that the respective assertions advanced on behalf of the Immigration Service and the Customs Service as to the propriety and equity of plaintiff's claim to rent cannot serve to nullify the factual as well as the legal implication inherent in their continued occupation of plaintiff's property, i. e., that compensation should and would be made for such use in the event plaintiff insisted strongly enough upon the full measure of its legal rights on the existing facts. Plaintiff was not required to go to the extent of locking the doors against defendant.

That the Services themselves did not intend to imply that on the facts they would not be liable in a legal sense for the payment of rental for future occupancy, if plaintiff insisted upon it, is evident from their additional response to plaintiff's request for rent, that there were no funds presently available under their current appropriations for the payment of rental to plaintiff, and that if plaintiff should con-

tinue to insist upon payment that they would be disposed to submit the matter to Congress, with a view to being relieved of such obligation.

In 1939, faced with the continued insistence by plaintiff that rent be paid and with the fact that rental was being paid to certain other bridge owners, the Treasury Department did, with the knowledge and approval of the Secretary of Labor, seek unsuccessfully to secure from Congress legislation that would relieve the Services from the obligation to pay rental for inspectional facilities at international toll bridges.

The fact that the Customs Service contemplated it would have to respond to plaintiff's insistence upon payment of rent, unless and until such time as Congress should see fit to relieve it of such obligation, is fairly indicated by a letter from the Assistant Commissioner of Customs to the plaintiff dated September 14, 1938, acknowledging the latter's renewed request and demand for rent, wherein he states "No amount is included in the appropriation now available to the Bureau for the current fiscal year for rental expenditures in excess of existing commitments, and it is doubtful whether any payment of rental for these quarters would be possible prior to July 1, 1939."

Evidence of like import with regard to the Immigration Service is disclosed by the appearance of the Assistant to the Commissioner of Immigration, before the Committee on Appropriations of the House of Representatives in the First Session of the 76th Congress, in justification of an increase in the 1939 budget estimate for rents for the Immigration Service. The substance of his testimony was to the effect that the Immigration Service had been requested by plaintiff to pay rent for quarters at the Peace Bridge, that up to that time action had been deferred, that the estimate was $6,325, that the Bureau did not have funds in its appropriation for the current year to take on such additional expense, that the Bureau had endeavored to get the bridge authority to furnish the quarters without charge, that it appeared to be a reasonable charge for space of like kind in the locality, and that before it would be paid, the matter would be referred to the Division of Procurement of the Treasury Department, the Bureau to be guided by their advice.

Except for the occasion just referred to there is no evidence that specific budget estimates, covering rental of particular quarters at international bridges for the use of the two Services, were submitted to Congress during the years for which plaintiff seeks payment of rent. However, the evidence definitely shows that during the period subsequent to August 2, 1938, here involved, budget estimates specifying sums for rental of space generally for the use of the Immigration and Customs Services, respectively, were presented biennially to Congress, that such specified lump sums were sufficiently large to have included, as to each service, payment of an amount of rent on the quarters here involved at the yearly rental values which we have found to be reasonable, and that Congress annually appropriated sufficient funds for the payment of such rentals as part of the lump sum appropriations for the expenses of enforcement of the customs and immigration laws including rental of quarters. The funds appropriated for the expenses of the two Services were not so earmarked as to exclude their use in payment of rent to plaintiff.

Plaintiff contends that Congress, by virtue of the provisions of its act of June 26, 1930, 46 Stat. 817, has expressed its intent that the lump-sum appropriations for the two Services should be used in part to rent buildings along the Canadian and Mexican borders where no Federal buildings are available, and where private buildings adapted and suitably located for the enforcement of the customs and immigration laws are available for rental; and to this extent plaintiff appears to predicate the jurisdiction of this court to entertain its suit upon a law of Congress. The statute reads as follows:

"An Act To provide better facilities for the enforcement of the customs and immigration laws.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That to provide better facilities for the enforce-

ment of the customs and immigration laws along the Canadian and Mexican borders at points where no Federal buildings are available or buildings adapted or suitably located for the purpose are available for rental, the Secretary of the Treasury and the Secretary of Labor are hereby authorized to expend from the funds appropriated for the general maintenance and operation of the Customs and Immigration Services, respectively, the necessary amounts for the acquisition of land and the erection of buildings, sheds, and office quarters, including living quarters for officers where none are otherwise available: Provided, That the total amount which may be expended for any one project, for the use of one department, including the cost of the site, shall not exceed $3,000, and that where quarters are erected or facilities provided for the joint use of the Customs and Immigration Services the combined cost charged to the two appropriations concerned shall not exceed $6,000 for any one project, including the site."

While we are not prepared to go so far as to find that the statute relied upon by plaintiff is sufficient to constitute its claim "a claim founded upon a law of Congress" we may consider its terms in determining whether Congress intended that operators of international bridges should furnish free of charge inspection facilities to the cost of which the Government had not contributed, for the Customs and the Immigration Services, or, on the other hand, that such Services might expend from the funds appropriated for their general maintenance and operation necessary amounts to rent suitable facilities along the borders, where no Federal buildings were available for such purpose.

It seems clear that the respective heads of the two Services had ample authority under which they might have expended a reasonable portion of the general funds appropriated for their use in payment for the facilities used at the Peace Bridge. This is the normal implication of the statute. It must be apparent, therefore, that the repeated assertions made to plaintiff by the two Services that funds were not available to pay for the use of plaintiff's property were simply excuses to avoid payment, in furtherance of the policy of the two Services to try to obtain inspectional facilities free of charge.

It is also clear that plaintiff's claim is not one sounding in tort. No element of wrongdoing, or of unauthorized or prohibited taking of the use of plaintiff's property is involved, unless it be found in the insistence of the Government's officers that, notwithstanding they had no lawful authority on the facts to occupy plaintiff's property lawfully in the exercise of their proper authority, and under the implied promise implicit in the Constitution of the United States that compensation would be made, they chose to act as wrongdoers and intended that the occupancy of plaintiff's property should be had without regard to its right to payment for the use. However, the use by the Services of the facilities for which plaintiff here seeks to recover was on its face lawful, it was had with the plaintiff's consent, and the use of the facilities on a rental basis was within the authority granted to the two Services by Congress. They cannot now be heard to say that they intended otherwise, so as to defeat the implied promise to compensate the owner, which is implicit in the circumstances surrounding such use.

"It is a general principle that where an act may rightfully be done with certain consequences or effects, the actor cannot assert for his own advantage to avoid that effect that the act was done wrongfully." Williston on Contracts, Rev.Ed. sec. 1856.

We are of the opinion that an obligation and undertaking to compensate plaintiff for the fair and reasonable value of the use of the space and facilities furnished after the demand of August 2, 1938, may be fairly implied in fact from all the circumstances surrounding the continued occupancy of plaintiff's premises by the two Services subsequent to that date. United States v. North American Transportation and Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; International Harvester Co. of America v. United States, 72 Ct.Cl. 707.

In contending that the right to control the lump sum appropriations by Congress for the two Services is discretionary with

the administrative officers in the absence of a mandatory direction by Congress to the contrary, and that Congress in enacting the annual lump sum appropriations for the two Services did not intend to direct the officials of these Services what leases they must enter into, defendant misconceives the nature of the relief sought by plaintiff. Plaintiff simply seeks to recover a money judgment, upon an implied contract for a quantum meruit, the fair and reasonable value of the use of its property which the Customs and Immigration Services have used and of which the defendant has had the benefit. Clark v. United States, 95 U.S. 539, 542, 24 L.Ed. 518. It is not, as defendant suggests, seeking to have this court exercise the discretion its officers should have used and write a ·lease for the parties.

■ If it was the duty of the two Services to enter into leases with plaintiff for the premises occupied they could not be heard to say, when plaintiff demanded payment, that they were not liable simply because they refused to enter into that contract which the facts and the law made it their duty to execute. International Harvester Co. of America v. United States, supra. Cf. American Mail Line, Ltd. v. United States, 105 Ct.Cl. 1. Assuming without deciding that the two Services were under no compulsion, by virtue of the appropriation acts, or otherwise, to enter into leases with the plaintiff when so requested, the fact remains that the Services, having authority to rent suitable facilities for their use at international bridges, did, in pursuit of such right, continue to occupy plaintiff's property knowing plaintiff had demanded rent and expected to be paid therefor. In the circumstances we think there was an implied agreement in the facts, both in the minds of the parties and under the Fifth Amendment. International Harvester Co. of America v. United States, supra. The authorized officials simply arbitrarily refused to pay a reasonable rental, not on the basis of the existing rights of the Government but on the basis of what they thought plaintiff ought to do (see finding 7).

In Semmes and Barbour v. United States, 26 Ct.Cl. 119, 130, where it appeared that the Post Office Department after expiration of its lease at a yearly rental of $5,000 continued to hold and use plaintiff's property, notwithstanding the latter's ·demand that an increased rental be paid thereafter, the court, in allowing the landlord to recover, said:

"These provisions [Sections 3679 and 3732, R.S., 31 U.S.C.A. § 665, 41 U.S.C.A. § 11] undoubtedly apply to express contracts, and prohibit the making of such contracts except as therein provided. They have no application to that class of implied contracts which arise from the acts of public officers, in the performance of their duties, in carrying on the business of the Government intrusted to them by law in their respective spheres. * * *"

"While no contract that he [the Postmaster General] can make for the use of a building would be binding on the Government, as to the time of occupying or price to be paid, or any other matters whatever, he may undoubtedly take possession of any building, suitable and necessary for the exigencies of the office, and leave the owner to his remedy in the courts for compensation on an implied assumpsit, which would arise under the Constitution whenever private property as such is taken for public use."

The instant case is not unlike United States v. Berdan Firearms Mfg. Co., 156 U.S. 552, 567, 15 S.Ct. 420, 424, 39 L.Ed. 530, where the Supreme Court sustained this Court in allowing the plaintiff to recover compensation for the use by the Government of plaintiff's patented extractor-ejector device. The defendant there contended that the action was one for infringement, since the Government did not deem that it was using plaintiff's device, and hence that no promise or undertaking for compensation for its use could be implied. This court found that Berdan, as an officer of plaintiff company, was in constant communication with the Government's Ordnance officers, requesting the use of his devices by the Government; they knew him as an inventor, and knew his inventions as soon as they were patented; and they knew plaintiffs desired the Government should use their patented devices and also desired and requested compensa-

tion for such use. In discussing these findings the Supreme Court observed that: "So far, then, as the petitioner is concerned, the use of this invention was with its consent, in accordance with its wish, and with the thought of compensation therefor. While the findings are not so specific and emphatic as to the assent of the government to the terms of any contract, yet we think they are sufficient. There was certainly no denial of the patentee's rights to the invention; no assertion on the part of the government that the patent was wrongfully issued; no claim of a right to use the invention regardless of the patent; no disregard of all claims of the patentee, and no use in spite of protest or remonstrance. Negatively, at least, the findings are clear. The government used the invention with the consent and express permission of the owner, and it did not, while so using it, repudiate the title of such owner."

Just as in the Berdan case and the International Harvester case, supra, the Government's use here was with plaintiff's consent, in accordance with its wish, and with the thought of compensation therefor. And if the evidence of assent by the Government to an obligation or undertaking for compensation was not so specific and emphatic, negatively, at least, such fact appears from its continued use of the premises, after plaintiff's announcement that it expected to be paid therefor, without repudiating plaintiff's title, or claiming some paramount right to retain possession rent free without regard to plaintiff's expectations; and from its excuses that there was no legislative provision for paying plaintiff, and that if recourse were had to Congress the latter might see fit to amend its laws so as to require plaintiff to provide quarters to the two Services without charge. The latter ground was soon repudiated by Congress and the use by the Services continued.

A result contrary to the Berdan case has been reached in those cases where the Government purported to act under some right or title adverse to plaintiff, Tempel v. United States, 248 U.S. 121, 39 S.Ct. 56, 63 L.Ed. 162; Hill v. United States, 149 U.S. 593, 13 S.Ct. 1011, 37 L.Ed. 862; or in the face of plaintiff's objection thereto, Klebe et al. v. United States, 263 U.S. 188, 44 S. Ct. 58, 68 L.Ed. 244; or entirely aloof from plaintiff's interest in the subject matter, Morse Dry Dock & Repair Co. v. United States, 77 Ct.Cl. 57; or in ignorance of plaintiff's interest, Dykes's Case, 16 Ct.Cl. 289. These cases, submitted by counsel for defendant as authority for the proposition that no relation of contract existed between the parties in the instant case, are readily distinguishable on the ground that in each of them the facts clearly preclude any implication of a promise.

Equally distinguishable are those cases where the act purporting to be on behalf of the Government is the act of some officer without authority to bind it. Filor v. United States, 9 Wall. 45, 19 L.Ed. 549; Beach v. United States, 226 U.S. 243, 260, 33 S.Ct. 20, 57 L.Ed. 205; The Curved Electrotype Plate Company of New York v. United States, 50 Ct.Cl. 258, 273. See, also, United States v. North American Transportation & Trading Company, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935. In such cases the act is, so far as the Government is concerned, "the work of strangers." As stated in the North American case, 253 U.S. at p. 333, 40 S.Ct. at page 520, "In order that the government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress or by the official upon whom Congress conferred the power."

So long as plaintiff is limited to a recovery of the fair value of that which the Services have enjoyed at plaintiff's expense after its demand for compensation, and within the bounds of the authority necessarily implied in the enactments applicable to such Services, no violence is done to the principle employed in Hooe v. United States, 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055, that "Congress holds the purse strings" and may limit governmental expenditures for rent and other purposes. In the Hooe case Congress had specifically limited the amount that could be expended for quarters for the Civil Service Commission, and it was held that the building owner was limited to such amount of rent, notwithstanding additional space had been oc-

486

cupied by the Commission not within the space originally contemplated. Since the Secretary of the Interior was without power to make any express contract for rent in excess of the appropriation made by Congress, wherein it was specified that the appropriation should be in full compensation for the specific purpose named in the appropriation act, it followed that he could not, by his acts, create an implied contract on the part of the Government which would defeat the express limitation made by Congress. The difficulty encountered in the Hooe case does not exist here.

In United States v. North American Transportation & Trading Co., supra, it was pointed out at p. 333 of 253 U.S., and at page 520 of 40 S.Ct., that certain acts of Congress making appropriations for barracks and quarters for troops furnished sufficient authorization from Congress to the Secretary of War to take land for such purposes, and conferred upon him the power to determine whether an army post should be established and what land should be taken therefor. The present case is not to be distinguished, simply because the initial taking of possession was with the plaintiff's acquiescence or at its invitation, and without claim for compensation at the time, when it appears that subsequently possession was retained in the face of plaintiff's demand for payment of rent, without claim by defendant of a legal or contractual obligation on the part of plaintiff to provide the premises free of charge, or of any legal or contractual right in the Government to continue using the property without payment of reasonable rental as compensation for such continued use. To allow plaintiff to recover from the Government the fair and reasonable value of the use of its property had by the Customs and Immigration Services since August 2, 1938, does no more under the facts and circumstances of the case, than to give effect to the well established implied promise rule stated by the court in the North American case, supra, 253 U.S. at page 333, 40 S.Ct. at page

519, that "When the government, without instituting condemnation proceedings, appropriates for a public use under legislative authority private property to which it asserts no title, it impliedly promises to pay therefor."

This rule was applied in International Harvester Company v. United States, 72 Ct.Cl. 707, 712–719. In that case one Johnson, who had entered into a construction contract with the Government, had acquired certain trucks from the Harvester Company under a conditional sales contract in which the vendor retained title. Johnson defaulted and was declared a bankrupt and his right to proceed was terminated. The Harvester Company requested the Government to return the trucks to it and later demanded payment of compensation for their use. Both requests were refused by the Government's contracting officer. We held that in the facts and circumstances there arose an obligation and undertaking on the part of the Government to pay for the use of the trucks since at no time did the Government claim ownership of the trucks and did not, at any time, question the plaintiff's title and ownership. The plaintiff was allowed to recover compensation for such use measured by the reasonable rental value of the trucks.

Plaintiff is entitled to recover $38,636.33 as compensation for the use of its property, facilities, and services rendered, measured by the fair and reasonable rental value of such property and facilities, including the services in connection therewith, at the rate of $9,470.96 per annum, as set forth in findings 11 and 12.

Judgment will, therefore, be entered in favor of plaintiff for $38,636.33. It is so ordered.

WHALEY, Chief Justice, and JONES and WHITAKER, Judges, concur.

MADDEN, Judge, took no part in the decision of this case.