**Ambrosio CHAVEZ, et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 392–87C.

United States Claims Court.

Oct. 27, 1989.

K. Douglas Perrin, Roswell, N.M., for plaintiffs.

Scott Ray, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart E. Schiffer, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This action came before the court on defendant's motion for summary judgment pursuant to RUSCC 56. Defendant maintained that because plaintiff Richards orally contracted with officers of the United States Department of Agriculture who were not authorized to contract under the program involved in this case, no express or implied-in-fact contract existed.

## FACTS

Plaintiff, Tags Richards, claimed that the United States refused to pay for services rendered on an irrigation project in Lincoln County, New Mexico. He asserted that defendant, acting through the Soil Conservation Service (SCS) and the Agricultural Stabilization and Conservation Service (ASCS) of the United States Department of Agriculture, entered into an oral contract with him in May of 1981 under the Agricultural Conservation Program, 16 U.S.C. § 590a et seq. (1982), whereby he was commissioned to repair and replace a portion of the Ambrosio Chavez irrigation pipeline. Plaintiff further asserted that his contract with defendant did not rest solely on the oral assertions of SCS but also on the alleged request of the ASCS. Plaintiff also claimed that the repairs were made for the benefit of SCS and ASCS, and that the ASCS had agreed to pay for the work completed by plaintiff.

The Amended Complaint recited in relevant part:

3. In the spring of 1980, certain land owners in Lincoln County, New Mexico who owned land and water rights along the so-called Ambrosio Chavez Ditch were approached by representatives of the Soil Conservation Service of the United States Department of Agriculture, all agents and employees of the Defendant United States, with a proposal to construct for those land owners a new underground pipeline to replace the surface ditch which had previously supplied water for the land owners crops for a number of years. Said agents and employees of the Defendant obligated the United States to pay virtually all of the cost of construction of the new pipeline. The land owners agreed to the proposal.

4. All of the design work for the new underground line was performed by agents and employees of the Defendant.

5. The Plaintiff Tags Richards is a general contractor in the State of New Mexico, and was hired to construct the underground pipeline.

6. In the spring of 1981, due to failures in and problems with the delivery of water from the underground pipeline, the United States, acting by and through its agents in both the Soil Conservation Ser-

vice and the Agricultural Stabilization and Conservation Service, entered into an oral contract with the Plaintiff Tags Richards to repair and replace a portion of the line in approximately May of 1981. The repair and replacement work was properly and timely performed and completed by the Plaintiff Tags Richards in the summer of 1981.

7. But for the promises of payment made by representatives of both the SCS and ASCS, the Plaintiff Tags Richards would not have undertaken nor performed the work that was performed. For this work, which apparently was timely and properly performed, plaintiff claimed a right to payment of $13,833.20.

Plaintiff Richards and Agricultural Plaintiffs[1] originally filed suit in the United States District Court for the District of New Mexico seeking relief under the Federal Torts Claims Act. The district court dismissed Richards' claim *sua sponte* for lack of jurisdiction. *Niccum v. Lyng*, No. 87–0042C, slip op. at 1 (D.N.M. June 18, 1987). Agricultural Plaintiffs and Richards filed suit in this court six months after filing in the district court while the district court still had the claims of the Agricultural Plaintiffs under consideration. In response to a motion by defendant to dismiss per 28 U.S.C. § 1500 (1982), the claims of the Agricultural Plaintiffs were dismissed with prejudice because they were participants in a previously filed still active case in the district court. Because Richard's cause of action sounded in implied contract rather than in tort, this court retained jurisdiction over his claim. *Chavez v. United States*, 14 Cl.Ct. 212, 216 (1988).

Subsequent thereto, defendant filed a motion to dismiss Richards' claim under RUSCC 12(b) alleging that because neither the SCS nor the ASCS nor its officers and employees had authority under the Agricultural Conservation Program, governing the Ambrosio–Chavez pipeline project, to enter into contracts on behalf of the defendant, no contract existed. Defendant maintained that even if an agent of either service had been present at the time of creation of the purported contract, the United States is not bound by the unauthorized acts of its employees and that any party contracting with the government bears the risk of accurately ascertaining whether the individual or agency purporting to act for the government is operating within the bounds of their respective authority. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *Thanet Corp. v. United States*, 591 F.2d 629, 635, 219 Ct.Cl. 75 (1979).

The court considered defendant's motion to dismiss under the standards of *W.R. Cooper Gen. Contractor v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988) and *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), and "concluded that there [was] a 'possible basis on which the non-movant might prevail.'" *Chavez v. United States*, 15 Cl.Ct. 353, 360 (1988) (quoting *Cooper*, 843 F.2d at 1364).[2] It appeared to the court that a federal officer or employee could have been present at the meeting which allegedly gave rise to the oral contract. Furthermore, even if no person in attendance at the meeting had contracting authority as claimed by defendant, under the equitable powers applied by the Federal Circuit in *United States v. Amdahl*, 786 F.2d 387 (Fed.Cir.1986), plaintiff might have performed his services under an implied-in-fact contract.

Defendant then filed the present motion for summary judgment on the grounds that there is no genuine issue as to any material fact and defendant is entitled to judgment as a matter of law. Defendant maintained that plaintiff has failed to establish an en-

---

1. "Agricultural Plaintiffs" were those landowners, farmers and ranchers in the area whose lands benefited from Mr. Richards' work on the pipeline. For a more expansive factual history of this case see *Chavez v. United States*, 14 Cl.Ct. 212 (1988).

2. At the time of filing of the Order to defendant's Motion to dismiss this Court did not know for a fact that there were no federal employees present when Richards was asked to repair the pipeline nor that no SCS or ASCS officer or employee had authority under the Agricultural Conservation Program.

forceable express or implied-in-fact contract with the government. Defendant stated that the government employees had no authority to enter into the contract and the government received no benefit. Plaintiff refuted defendant's contentions, stating that the government employees had the authority to enter into the contract. Plaintiff also stated that there was a contract implied-in-fact because defendant received a benefit from the plaintiff.

## DISCUSSION

Summary judgment is only available where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Any doubts as to whether a genuine issue of material fact exists must be settled in favor of the non-moving party. *Housing Corp. v. United States*, 468 F.2d 922, 924, 199 Ct.Cl. 705 (1972); *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). Inferences drawn from the proposed facts must also be viewed in a light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Ball v. United States*, 1 Cl.Ct. 180, 183 (1982). In conjunction with the defendant's motion, the defendant has submitted Proposed Findings of Uncontroverted Fact and plaintiff the Plaintiff's Statement of Genuine Issues.

All the disputed issues raised by the parties hinge on two main disputes: (1) whether SCS or ASCS employees had authority to enter into the alleged contract with plaintiff Tags Richards, thus creating an enforceable oral contract; and (2) whether or not a contract implied-infact as applied in *United States v. Amdahl*, 786 F.2d 387 (Fed.Cir.1986), existed.

## A. *Authority to Create An Enforceable Oral Contract*

■ The Tucker Act vests jurisdiction in this court over "any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1) (1982). A contract with the United States can only exist if the contracting government agent has direct authority to obligate funds of the United States. *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 338–39 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984).

■ In the present case, the authority of the SCS is governed by 7 C.F.R. §§ 601.1 to –.5 and 7 C.F.R. § 700.5(d) (1981). Those provisions state in relevant part:

[T]he following functions [are assigned] to the Soil Conservation Service:

\* \* \* \* \* \*

(c) Administer the basic program of soil and water conservation under Pub.L. 46, 74th Congress, as amended, and related laws (16 U.S.C. 590 a–f, i–l, q, q–1; 42 U.S.C. 3271–3274; 7 U.S.C. 2201), including:

(1) Technical assistance to land users in carrying out locally adopted soil and water conservation programs primarily through the conservation districts in the 50 States, Puerto Rico, and Virgin Islands, but also to communities, watershed groups, Federal and State agencies and other cooperators including such assistance as:

\* \* \* \* \* \*

(v) [Assist] other Department agencies in connection with the administration of their program, as follows:

(A) Agricultural Stabilization and Conservation Service in the development and technical servicing of certain programs, such as the rural environmental assistance program, water bank program, Appalachian regional development program and other such similar conservation programs.

7 C.F.R. § 601.1 (1981). Furthermore:

(d) *The Soil Conservation Service (SCS) shall:*

\* \* \* \* \* \*

(2) Coordinate technical assistance and recommend [an] appropriate agency or group to provide technical assistance on a project by project basis.

7 C.F.R. § 700.5(d) (1981).

Under this grant of authority, SCS had limited authority to give only technical as-

sistance to ASCS to accomplish the projects constructed under the Agricultural Conservation Program. The SCS had no authority to contract with any third party for services under that program.

The ASCS, on the other hand, had limited authority to grant monetary assistance, primarily through cost sharing. The regulations governing the ASCS and its authority to grant monetary assistance are far from clear. According to 7 C.F.R. sections 701.-15 and 701.21 (1981), monetary assistance is to be initially granted to farmers and ranchers who then assume responsibility for contracting out the various work projects. This principle was affirmed by David E. Turner, the Executive Director of the New Mexico State ASCS. He stated:

> Under the regulations of 7 C.F.R. Part 701, which govern the program under which the Ambrosio–Chavez pipeline was constructed and was to be maintained, the landowners whose property was to be benefitted by the pipeline, as Agricultural Conservation Program (ACP) participants, are themselves responsible to contract for construction, repair, and maintenance services of a contract like Mr. Richards. ASCS may pay the landowners a portion of the expenses of these activities upon application by the landowners for cost-sharing, but ASCS does not have the authority to contract directly with a contractor for these activities.

Declaration of David E. Turner at ¶ 4.

Further, the evidence before the court, which the parties do not dispute, demonstrates that only the county level ASCS was involved in the matter. The county level ASCS by law had no authority to enter into contracts with vendors. *See* 7 C.F.R. §§ 701.15, 701.21(a) (1981). Therefore no enforceable oral contract could have existed between plaintiff and defendant as neither the county ASCS nor the SCS had authority to bind the government in contract with the plaintiff.[3]

### B. *Offer and Acceptance*

■ For any express oral contract the evidence must show that the parties intended to be bound and that they expressed their intention in a way capable of understanding. It must be established that there was a definite offer and an unconditional acceptance. *City of Klawock v. United States*, 2 Cl.Ct. 580, 584 (1983), *aff'd*, 732 F.2d 168 (Fed.Cir.1984).

The documentation provided by the parties in this case does not show that there was any offer or acceptance between plaintiff Richards and the defendant. The Minutes of Lincoln County ASC Committee Meeting state: "The contractor stated that any failure that was his fault would be corrected by him at no expense to the group." Minutes of Lincoln County ASC Meeting on April 23, 1981, at 17. Apparently plaintiff Richards was a volunteer. There was no offer which can be discerned from the documentation. Consequently, not only was there no authority for the government to enter into the supposed contract here, there was no offer and acceptance upon which to base the contract.

### C. *Contract Implied–In–Fact*

The second issue centers on whether or not an implied-in-fact contract existed, regardless of whether government officers or employees had authority to bind the government, because plaintiff Richards conferred a benefit on the defendant.

■ An implied-in-fact contract exists when the conduct of the parties indicates mutual assent. An express offer and/or acceptance is absent. Implied-in-fact contracts require the same contractual elements as are required to establish an express contract, *i.e.*, mutuality of intent, of-

**3.** At this time, the court does not eliminate the possibility that the State level ASCS committee might have authority to enter into contracts with persons such as plaintiff Richards through cost-share payments in the form of "conservation materials and services when the committee determines that participants would not reason- ably be able to obtain conservation materials and services through the assignment of the Agricultural Conservation Program payments." 7 C.F.R. § 701.21(a) (1981). However, this point is mooted by the fact that, as discussed below, plaintiff Richards was apparently a volunteer.

fer and acceptance, consideration, and lack of ambiguity. Only the nature of the evidence differs. *Fincke v. United States*, 675 F.2d 289, 295, 230 Ct.Cl. 233 (1982); *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970). Further, the circumstances of a contract implied-in-fact must indicate that the parties have in fact taken upon themselves corresponding obligations and liabilities, and have come to a meeting of the minds. *Porter v. United States*, 496 F.2d 583, 590, 204 Ct.Cl. 355 (1974), *cert denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); *Brannan v. United States*, 7 Cl.Ct. 399, 404 (1985); *Gratkowski v. United States*, 6 Cl.Ct. 458, 461–62 (1984).

■ An implied-in-fact contract may be created through the acceptance of benefits with the knowledge that the supplier expects to be compensated. *Pacific Maritime Ass'n v. United States*, 108 F.Supp. 603, 123 Ct.Cl. 667, 675–77 (1952); *Buffalo & Fort Erie Pub. Bridge Auth. v. United States*, 65 F.Supp. 476, 106 Ct.Cl. 731 (1946). In *Pacific Maritime*, the government had continually accepted the labor referral services of the plaintiff, with the knowledge that the plaintiff expected to be paid, and without ever disclaiming an intention to pay. The government claimed that the plaintiff was at all times advised that any agreement with respect to compensation would have to be approved by higher officials and that approval was never actually obtained. The *Pacific Maritime* court found that an implied-in-fact contract existed because of the government's continued use of such services subsequent to the demand. The government recognized the validity of the plaintiff's claim for payment of the services, and acknowledged its obligation to pay compensation. Because the government continued to request and receive the plaintiff's services, there became an implied-in-fact contract to pay reasonable compensation. It is not the fact that a benefit was conferred that created the contract implied-in-fact, but that there was an implied-in-fact agreement to compensate the contractor for the benefit which was conferred.

■ Under this analysis, in the present case there was no such implied-in-fact contract. The mere conferring of a benefit on the government does not create an implied-in-fact contractual relationship. Implied-in-fact contracts require conduct of the parties manifesting assent. Here, unlike *Pacific Maritime*, the government did not recognize the validity of the plaintiff's claim for payment of the services. Also, there was no contracting authority vested in the county ASCS. Implied-in-fact contracts must be based on the conduct of authorized employees. *Pacific Gas & Elec. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). Furthermore, as discussed above, there was no offer and acceptance. Plaintiff Richards was apparently a volunteer. Implied-in-fact contracts require the same contractual elements as are required to establish an express contract, *i.e.*, offer and acceptance. *Fincke v. United States*, 675 F.2d 289, 295, 230 Ct.Cl. 233 (1982); *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970).

■ In a private transaction, the conferring of a benefit may allow recovery under a quasi-contract or implied-in-law contract. However, these claims are not actionable under the Tucker Act. While the Tucker Act vests jurisdiction in this court over implied contracts, it does not reach claims based on contracts implied-in-law. *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Porter v. United States*, 496 F.2d 583, 590 n. 5, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). A contract implied-in-law is one in which no actual agreement between the parties occurred but where a duty is imposed by equity to prevent injustice. *Algonac Mfg. Co. v. United States*, 428 F.2d 1241, 1255–56, 192 Ct.Cl. 649 (1970); *Hirschmann v. United States*, 11 Cl.Ct. 338, 342 (1986).

Despite this distinction of contracts implied-in-fact and contracts implied-in-law, the Court of Appeals for the Federal Cir-

cuit has concluded that there are situations in which it will conclude that a contract implied-in-fact exists even though the contract is unenforceable, or even illegal. *United States v. Amdahl,* 786 F.2d 387, 393 (Fed.Cir.1986). In *Amdahl,* the Federal Circuit stated that recovery could be allowed under a contract "implied-in-fact" because the disallowance of recovery would violate the court's "good conscience to impose upon the contractor *all* economic loss from having entered [into] an illegal contract." *Id.* at 393 (emphasis in original). The Amdahl Corporation had protested the purchase of a computer mainframe by the Treasury Department from the Federal Home Loan Mortgage Corporation on the grounds that the purchase was contrary to the delegation of procurement authority from the General Services Administration. In ruling on the case, the Federal Circuit first stated the Black Letter law "that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity.... The courts are bound to strike down illegal contracts.... Thus, no damages can be awarded for 'breach' of a nullity." *Id.* at 392–93 (citations omitted). Then, the Court of Appeals for the Federal Circuit, in an exercise of its equitable jurisdiction, stated:

> Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a *quantum valebant* or *quantum meruit* basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity.

*Id.* at 393. The Court of Appeals for the Federal Circuit held the contractor was not to be compensated under the existing contract, but rather under an implied-in-fact or implied-in-law contract. *Id.* The *Amdahl* decision quoted from *Prestex, Inc. v. United States,* 320 F.2d 367, 373, 162 Ct.Cl. 620 (1963), to emphasize that:

> "Even though a contract be unenforceable against the Government, because not properly advertised, not authorized, or for some other reason, it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it. In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract. No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason. However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services."

*Amdahl,* 786 F.2d at 393.

 This concept of "fairness or equity" embraced by the Court of Appeals for the Federal Circuit seems to be inapposite to the long-established principle that contracts must be awarded in accordance with the law and regulations, and that only an agent expressly authorized to bind the United States contractually may do so. Nonetheless, it appears as if the "equitable" exception to the law as expressed in *Amdahl* and a handful of predecessor decisions would have this court grant relief to plaintiff under contracts implied-in-fact if the government received and kept a benefit from plaintiff's labor even though they actually would be contracts implied-in-law. Defendant would be, without more, liable under the "ordinary principles of equity" for the fair value of the benefit. *Prestex,* 320 F.2d at 373. It is clear that the theory of contract which the *Amdahl* court expounded more properly fits under the definition of a contract implied-in-law as opposed to a contract implied-in-fact. This is because a contract implied-in-fact may exist only when all the elements of an express contract are present, *Fincke v. United States,* 675 F.2d 289, 295, 230 Ct.Cl. 233 (1982) and *Algonac Mfg. Co. v. United States,* 428 F.2d 1241, 1255, 192 Ct.Cl. 649 (1970), and in *Amdahl* all the elements of a contract were not present. In *Amdahl,* the contract was rendered invalid because of

the failure of the contracting officer to comply with statutory requirements in making an award. However *Amdahl* referred to the contract as implied-in-fact, although *Amdahl* speaks of contracts being unenforceable if they are "not authorized. . . ." *Amdahl*, 786 F.2d at 393 (quoting *Prestex*, 320 F.2d at 373). Thus the recovery to which *Amdahl* refers would have to be under a contract implied-in-law, which is a remedy imposed by a court having the requisite jurisdiction when no contract or contract implied-in-fact exists.[4] Finally, *Amdahl's* cite to *Prestex* speaks of a court's "grant[ing] relief of a quasi-contractual nature when the Government elects to rescind an invalid contract." *Amdahl*, 786 F.2d at 393. Quasi-contractual relief is a contract implied-in-law. *Russell Corp. v. United States*, 537 F.2d 474, 210 Ct.Cl. 596, 609 (1976), *cert. denied*, 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977).

 Because the Court of Appeals for the Federal Circuit is an Article Three court of the United States Constitution, its exercise of equitable power in *Amdahl* was within its jurisdictional mandate. However, this court is an Article One court with very specific jurisdiction granted by the congress. This legislative grant of equitable jurisdiction is to be strictly construed. *See United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1373 (Fed. Cir.1983). Consequently this court believes itself devoid of equitable jurisdiction in this area of the law. As such, we have no equity jurisdiction to redress contracts implied-in-law. *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 2968, 77 L.Ed.2d 580 (1983); *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925); *Porter v. United States*, 496 F.2d 583, 590 n. 5, 204 Ct.Cl. 355 (1974), *cert. denied*, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975). Accordingly, this court does not interpret *Amdahl* to permit this court to exercise equity jurisdiction over contracts implied-in-law.

In the alternative, even if this court were to accept the characterization in *Amdahl* of a contract implied-in-fact, *Amdahl* is factually distinguishable. In *Amdahl* a contract was entered into by authorized persons and it was only later, after the authorized persons acted beyond the scope of their authority, that the contract was rescinded as illegal. In the instant case a contract was never entered into by authorized persons. This difference is substantial. In *H. Landau & Co. v. United States*, 16 Cl.Ct. 35 (1988), *vacated on other grounds*, 886 F.2d 322 (CAFC 1989), Judge Bruggink was faced with a similar situation to the case at bar. In distinguishing *Amdahl*, Judge Bruggink stated:

> While *Amdahl* recognizes that illegality of the terms of a contract is a form of lack of authority, and that the contractor assumes the risk of lack of actual authority in the agency to enter into the contract, it nevertheless only identifies an exception to the rule of total governmental non-liability in circumstances of rescission for illegality. Although the distinction may seem more one of degree than kind, the degree is significant. In the one instance both parties are, presumably in good faith, agreed on the terms of a contract and have begun performance. It is only later that an unanticipated legal obstacle to performance arises. In the other, the persons legally charged to represent the Government have never acted. The potential for abuse is obviously much greater in the latter circumstance. . . . the court declines to interpret *Amdahl* as extending beyond the circumstances described above.

*H. Landau & Co.*, 16 Cl.Ct. at 39–40 (citation omitted). Consequently, under this alternative, the theory of contracts implied-in-fact espoused in *Amdahl* should only apply in limited circumstances such as that as occurred in *Amdahl*, when a contract was in fact entered into by persons authorized.

**4.** The measure of recovery in an action on a contract implied-in-law is the reasonable value of the goods or services furnished to the benefit- ed defendant. *Campbell v. Tennessee Valley Auth.*, 421 F.2d 293, 296 (5th Cir.1969).

**548**

It is clear in the present action that all of the elements of an express contract were not present, nor could they be inferred; no one involved had authority to contract with plaintiff on behalf of the government and implied-in-fact contracts must be based on the conduct of employees authorized to act. *Pacific Gas & Elec. Co. v. United States*, 3 Cl.Ct. 329, 339 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984). Neither the SCS, nor the county ASCS, nor any of its officers or agents, had authority to contract with Richards, at least under the Agricultural Conservation Program. Therefore, there could not have been a contract implied-in-fact in the instant case. This is not to say that Richards is not without a remedy. He may well have a remedy against the Agricultural Plaintiffs, but certainly not against the United States.

Moreover, from the evidence presented to the court it is not readily apparent that there was a benefit conferred upon the government.[5] The court surmises that there may have been a benefit to the government from the information it gained by the work done by plaintiff Richards, but that is not readily clear and is extremely hypothetical. Assuming, *arguendo*, that there was some benefit to the government, plaintiff's claims still lie beyond the limited equitable jurisdiction of this court.

## CONCLUSION

Defendant's motion for summary judgment is granted. The court is persuaded

---

**5.** Defendant suggests that the plaintiff could not have conferred any benefit to the government because it was the Ditch Association that the plaintiff contracted with, and it was the Ditch Association that received the benefit from plaintiff's work. Defendant's Motion for Summary Judgment at 13–16. Defendant is correct. 16 U.S.C. §§ 590a; 7 C.F.R. § 701. David E. Turner, State Executive Director of the New Mexico State ASCS, stated: "Under the regulations of 7 C.F.R. Part 701, which govern the program under which the Ambrosio–Chavez pipeline was constructed and was to be maintained, the landowners whose property was to be *benefitted* by the pipeline, as Agricultural Conservation Program (ACP) participants, are themselves responsible to contract for construction...." Declaration of David E. Turner at ¶ 4 (emphasis added). *See* 7 C.F.R. §§ 701.1(a)–.1(b), 701.16. Also, 7 C.F.R. § 701.1(a) states:

that there was no authority for the county ASCS or the SCS to enter into an express or implied contract of any kind with plaintiff. Furthermore, even if there may have been a benefit conferred upon the government, which the government retained and used under an implied-in-law contract, this court lacks jurisdiction to address contracts implied-in-law. Accordingly, the complaint is dismissed and the clerk is directed to enter judgment against plaintiff. No costs.

IT IS SO ORDERED.

(a) Through the conservation and environmental programs administered by the Department of Agriculture, the Federal Government will share with farmers, ranchers, and other eligible private landowners in the United States and the applicable territories and possessions of the United States, the cost of carrying out:

(1) Approved soil and water conservation and pollution abatement practices, including related wildlife conservation practices.

From this language it is clear that it is the landowners who benefitted from the conservation practices. The Government merely shared in the cost of carrying out the practices.

