Diane M. STEVENS, Christina Karson, Esmene Kordos, James Stevens, Nick Kordos & Theodore Stevens, a partnership,

and

Theodore Stevens, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 7–88C.

United States Claims Court.

July 27, 1990.

Alexander A. Pires, Jr., Washington, D.C., for plaintiffs.

Douglas J. Hughes, with whom were Mary Mitchelson and Terrence S. Hartman, Asst. Directors, David M. Cohen, Director, and Stuart M. Gerson, and John R. Bolton, Asst. Attys. Gen., U.S. Dept. of Justice, Washington, D.C., for defendant. David P. Grahn, U.S. Dept. of Agriculture, of counsel.

## OPINION

SMITH, Chief Judge.

This case comes before the court on defendant's motion to dismiss the complaint, or in the alternative, for summary judgment.[1] Plaintiffs ask the court to overturn an administrative agency's determination that they are not eligible to participate in a federal agricultural subsidy program, and seek $2.2 million in damages. Defendant argues that the court lacks jurisdiction to hear the case, and that even if it could hear the case, plaintiffs are not entitled to the relief they seek. For the reasons set forth below, defendant's motion is granted.

### FACTS [2]

Plaintiffs are partners in Stevens Farming, a Montana partnership. Theodore Stevens, a partner in Stevens Farming, also sues in his individual capacity. The partnership was organized in 1985, ostensibly for the purpose of leasing the property and raising wheat on the 14,000-acre Mizpah Farm, located in Custer County, Montana. Mizpah was jointly owned in 1985 by First Continental Corporation (20.6% interest) and Theodore and Amelia Stevens (undivided 79.4% interest). First Continental planted the 1986 wheat crop at Mizpah.

Each partner in Stevens Farming contributed $166.67 to the initial $1000 capital investment, in return for an equal share in any profits the partnership might make. Stevens Farming also applied for a loan of approximately $910,000 from Wells Fargo AgCredit, with the partners agreeing to assume joint liability for the debt.

On April 15, 1986 the partnership submitted an application for participation in the 1986 Price Support and Production Adjustment Program (the wheat program), which is administered by the Commodity Credit Corporation (CCC), through the Agricultural Stabilization and Conservation Service (ASCS), an agency of the United States Department of Agriculture (USDA). The application is standard form CCC–47, and as stated in its appendix, is a proposed contract: "Eligible producers may offer to enter into a contract with the CCC by executing a contract and submitting it to the county ASCS office." 7 C.F.R. § 713 (1988).

The wheat program is a price and income support program, aimed at stabilizing the domestic wheat market. The program subsidizes producers of wheat who qualify for the program and comply with its restric-

---

1. The government's motion is captioned simply "Defendant's Motion for Summary Judgment," but a considerable portion of the brief in support of the motion is devoted to the argument that the court lacks subject matter jurisdiction over this action.

2. The court relies upon the complaint, the administrative record, defendant's proposed findings of uncontroverted fact, and the representations of counsel at oral argument, for the factual background.

tions throughout the crop year. In essence, the program pays wheat producers to grow less wheat than they otherwise would. If an applicant had no financial stake in the production of wheat, then the program's purpose would be frustrated by allowing such an applicant to receive benefits.

For the purposes of the commodity price support programs, a producer is "a person who, as owner, landlord, tenant, or sharecropper, shares in the risk of producing the crop, or would have shared had the crops been produced." 7 C.F.R. § 719.2(t) (1986). To be eligible for the 1986 wheat program:

The producer must be a person who shares in the risk of producing the program crop produced in the current year (or shares in the proceeds therefrom) on the farm for which the contract is submitted, or would have shared in the crop if it had been produced on such farm in the current year.

7 C.F.R. § 713.50(b) (1986).

Along with its application for the wheat program, Stevens Farming also submitted a copy of its lease for Mizpah, executed on February 15, 1986 by the partnership and First Continental. The lease provided: "[t]his lease is subject to the property qualifying for the ASCS government program[, and if] Lessee is unable to obtain crop financing for any year, Lessee will notify Lessor of this event by Certified Mail. If this occurs, Lessor and Lessee agree to cancel lease. Further, Lessor agrees to undertake all farming operations."

After Stevens Farming submitted the application, the CCC requested that further evidence be proffered before it could make a determination of eligibility. The committee, in a letter dated May 30, 1986, stated that it was unable to see a substantive change from the operator then in place, First Continental Corporation, for purposes of the $50,000 per person payment limitation. 7 C.F.R. § 795. Specifically, the CCC was concerned that the application ran

afoul of section 795.14 of 7 C.F.R. (1988), which states in part:

Any document presenting a ... lease which is fictitious or not legally binding as between the parties thereto shall be considered to be for the purpose of evading the payment limitation and shall be disregarded for the purpose of applying the payment limitation. Any change in farming operations that would otherwise serve to increase the number of persons for application of the payment limitation must be bona fide and substantive.

James Geis, the manager of Mizpah and an employee of Stevens Farming, wrote a letter to the State Committee along with notice of Stevens Farming's appeal from the May 30 decision. In this letter, Mr. Geis spoke of the "catch-22" situation involving Stevens Farming: the operating loan from Wells Fargo AgCredit was contingent on the admission of the partnership into the wheat program, yet the CCC would not admit the partnership into the program until the partnership bought out the crop from First Continental; the partnership, in turn, could not buy out the crop without the operating loan from Wells Fargo.[3]

The State Committee responded in a letter to Stevens Farming that set forth precisely what was needed in order to have the partnership be considered the producer at Mizpah, for purposes of participating in the wheat program. Any new evidence would first have to be introduced to the County Committee for reconsideration. The State Committee stated that the CCC could make conditional approval to allow the financial arrangements to be completed once certain documents were introduced, but this conditional approval was explicitly stated to be subject to final review.

On June 24, 1986 Stevens Farming received a letter from Wells Fargo AgCredit, stating that approval of the loan was subject to execution and delivery of ten specified items. The tenth item was evidence of

---

**3.** Joseph Heller's novel of the same name popularized the phrase "catch-22". A catch-22 is a situation created by bureaucracies which require strict adherence to formalities and rules, ultimately resulting in circularity, stalemate, and frustration of the goals which the bureaucracies were ostensibly created to carry out.

the partnership's acceptance into the 1986 wheat program.

On July 9, 1986, the CCC sent a letter to Stevens Farming stating that the CCC still lacked concrete evidence that requirements set out by the State Committee were being met. The CCC conditionally approved the partnership's application if Stevens Farming would provide it with copies of the items specified 1–9 of the Wells Fargo AgCredit agreement, plus other documentation elaborated in the letter.

After the introduction of further evidence by the partnership, and a fact finding meeting, the CCC finally rendered a decision on December 5, 1986; the partnership was informed of the decision in a letter dated December 12, 1986. The CCC stated that the partnership had failed to prove it was the operator of the Mizpah Farm for the 1986 crop year, and that it considered Theodore Stevens and First Continental Corporation to be a combined entity. The CCC enumerated three factors as a basis for this determination: (i) that Continental had borne all the expenses to produce and harvest the crop; (ii) that Continental had control over the production of the crop; and (iii) that Wells Fargo accepted a lien from First Continental Corporation.

Stevens Farming requested reconsideration by the CCC, but upon reconsideration, the CCC stated, "it still appears that the CCC is expected to provide Wells Fargo with a document that can be interpreted by Wells Fargo as guaranteeing maximum possible payments … [and] at this late date in the crop year, it is difficult based on all information to conclude that Stevens Partnership could have been actively involved in operating the farm."

Stevens Farming appealed to the State Committee, before which Theodore Stevens appeared in person. No decision was made on the appeal date, February 25, 1987, and more information was requested of Mr. Stevens. On March 9, 1987 the Acting State Executive Director of the ASCS office requested authority to approve Stevens Farming's form CCC–477. On February 25, 1987 the State Committee determined that Stevens Farming was as much as anyone the operator of the farm in 1986. First Continental stated that although it had paid for almost all the costs related to the farming operation, it did not consider itself either the operator of the farm or as owning any interest in the grain.

On March 27, 1987 the State Committee affirmed the Custer County Committee's decision. On April 10, 1987 the Deputy Administrator of State and County Operations (DASCO) approved the March 9, 1987 request for authority to approve the application. However, the approval did state that no payment should be made until a "person" determination had been made for payment limitation purposes. The ASCS's decision was appealed to the Deputy Administrator. The Deputy, notwithstanding his prior approval, affirmed the ASCS's denial of the partnership's application on August 5, 1987. Having exhausted the administrative remedies Stevens Farming filed its complaint in this court.

Paragraph 20 of the complaint states that plaintiffs

have sustained damages as a result of defendant's breach of plaintiffs' contract to participate in defendant's 1986 wheat program. These damages include, but are not limited to (a) all plaintiffs, operating as Stevens Farming, losing not less than $350,000 from defendant's failure to pay said plaintiffs monies due as participants in the 1986 wheat program; (b) plaintiff Theodore Stevens losing $1.6 million in equity in his farm as a result of a foreclosure that occurred in August 1987 as a direct result of defendant's actions against him and against all plaintiffs; and (c) plaintiff Theodore Stevens losing over $220,000 in lost 1986 and 1987 lease payments caused by defendant's actions.

## DISCUSSION

### I. Theodore Stevens' claims.

Theodore Stevens, suing in his individual capacity, seeks $1,820,000 in damages, based on his "losing $1.6 million in equity in his farm as a result of a foreclosure"

and "losing ... \$220,000 in ... lease payments." For a myriad of reasons, the court cannot entertain either claim.

### A.  Lost equity.

■ Mr. Stevens avers that he lost equity in a farm that was sold at a foreclosure sale, and claims that this loss was occasioned by the wrongful exclusion of Stevens Farming from the wheat program. At the outset, the court notes that the precise nature of this loss of equity is mysterious. Under Montana law, the mortgagor retains title to the mortgaged property, and the lender has a lien in the amount of the balance due on the loan secured by the property. *See* Mont.Code 71–1–103. After a foreclosure sale, "[i]f there be surplus money remaining after the payment of the amount on the mortgage, lien, or encumbrance, ... the [Montana state] court may cause the same to be paid to the person entitled to it and in the meantime may direct it to be deposited in court." Mont.Code 71–1–225.

It is black-letter debtor-creditor law that a lienor who forecloses on the collateral is only entitled to that portion of the proceeds of the foreclosure sale necessary to pay off the outstanding debt. Nothing in the Montana Code changes this rule. If Mr. Stevens had \$1.6 million in equity in his farm prior to the foreclosure sale, he would not have "lost" this equity as a result of a foreclosure sale. At most, he has a right to petition the Montana court, or to sue the entity which foreclosed, for the \$1.6 million.

Assuming *arguendo* that Mr. Stevens has in fact lost \$1.6 million in equity in his farm, there is no legal theory under which the United States can be held liable for the loss. Mr. Stevens' only claim against the United States stems from his membership in Stevens Farming; he has no claim against the United States in his individual capacity. Mr. Stevens was not a party, in his individual capacity, to the application for admission to the wheat program, nor was he a third-party beneficiary to any contract with the United States. In short, the United States owed no duty to Mr.

Stevens relative to any foreclosure on his farm.

Finally, even assuming that the United States owed Mr. Stevens a duty in his individual capacity not to act arbitrarily and capriciously in considering the partnership's application for admission into the wheat program, and assuming that the United States breached that duty, and assuming that Mr. Stevens has in fact suffered a \$1.6 million loss, the loss was not the natural and probable consequence of the United States' breach of its duty, and thus, is not recoverable in this court. *See Gardner Displays Co. v. United States*, 346 F.2d 585, 171 Ct.Cl. 497, 505 (1965) (consequential damages not recoverable).

In short, construing Mr. Stevens' allegations in the light most favorable to him, he fails to state a claim upon which relief can be granted with respect to the lost equity claim. RUSCC 12(b)(4).

### B.  Lost lease payments.

■ For reasons similar to those given in part I.A. above, the court cannot entertain Mr. Stevens' claim for lost lease payments.

First, the United States owed Mr. Stevens no duty, in his individual capacity, with respect to the lease. The United States was not a party to the lease.

Second, the lease upon which this claim is apparently based was not a binding contract; it was automatically cancelled when the partnership's application for subsidies under the wheat program was denied. Since the lease was unenforceable under its own terms, Mr. Stevens has *no* right to expectancy damages.

Third, even assuming that the United States did owe Mr. Stevens a duty not to act arbitrarily and capriciously with respect to the partnership's application for subsidies, and assuming that the United States breached that duty, lost lease payments were not the natural and probable consequence of that breach.

Finally, the damages sought for lost lease payments are speculative; there is no reason to assume that had the partnership

been admitted to the wheat program, it would have received as much as $220,000 in payments under the program, and even if it had received $220,000, there is no reason to assume that the subsidy payments would have been dedicated to rent payments under the lease. *See Malissa Co. v. United States*, 11 Cl.Ct. 389, 392 (1986) ("Lost profits on future contracts are too speculative" to be basis for court's jurisdiction). If Mr. Stevens believes that he has a claim stemming from the lease, such claim is against the lessee, not the United States.

Again, making every assumption—reasonable or otherwise—in favor of Mr. Stevens, he fails to state a claim upon which relief can be granted. RUSCC 12(b)(4).

## II. Jurisdiction over the partnership's claim.

The partnership's challenge to the denial of its application for admission into the wheat program remains for consideration. Defendant argues that the partnership's claim is beyond this court's jurisdiction, or in the alternative, that the agency decision was correct.

The Tucker Act, 28 U.S.C. § 1491(a)(1) (1988), only confers jurisdiction on this court; it does not confer any substantive rights. One source of substantive rights traditionally relied upon are statutes mandating the payment of money.[4] *See generally Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 178 Ct.Cl. 599 (1967) (Court of Claims can take jurisdiction over claim arising under money-mandating statute so long as plaintiff's position is arguable).

■ 7 U.S.C. § 1445b–3(c) appears to be such a money mandating statute. That section provides in pertinent part that the "secretary shall make available to producers payments for each of the 1986 through 1990 crops of wheat." In *Grav v. United States*, 14 Cl.Ct. 390 (1988), *aff'd*, 886 F.2d 1305 (Fed.Cir.1989), this court held that the statute creating the milk diversion program

was an offer and therefore mandated payment. Unlike *Grav*, however, in the present case the language of the pertinent regulations cannot be construed to be an offer. The question becomes, then, whether the statute is money mandating even if it is not an offer.

In *Haupricht Bros., Inc. v. United States*, 11 Cl.Ct. 369 (1986), this court took jurisdiction over a claim similar to that of Stevens Farming. There, plaintiffs had applied to the CCC for enrollment in a payment in kind program for the crop year of 1983. The application was in the form of a proposed contract offering to withdraw the Haupricht farm from the production of corn. The County Committee determined, and the Deputy Administrator in Washington, D.C. subsequently concurred, that the Hauprichts were not producers as was required by the regulation. The regulation, 7 C.F.R. § 770.1 (1983), provided: "The Department of Agriculture will enter into contracts with operators and producers who agree to devote acreage normally planted to wheat [and] corn ... to a conserving use in return for compensation in the form of the commodity normally planted on the acreage." Judge White concluded that the court could clearly grant a monetary remedy if plaintiffs were to prevail on the merits, and thus, the court had jurisdiction over the Hauprichts' challenge to the agency decision.

Here, as in *Haupricht*, the application is an offer by producers to enter into a contract, and therefore the question on the merits pivots on whether one is a producer. Also, as in *Haupricht*, plaintiffs were determined to be ineligible for benefits because they were found not to be producers. If the court were to determine on the merits that plaintiffs were producers, then a money judgment based upon the statute could clearly be entered. Therefore, 7 U.S.C. § 1445b–3(c) is a statute mandating *payment of money, upon which jurisdiction* can be founded.[5]

---

4. Stevens Farming has also asserted jurisdiction based on an express contract, equitable estoppel, an implied-in-fact contract, and an implied-in-law contract. These arguments are discussed in part IV, *post* at 203–04.

5. Defendant argues that because the Secretary of Agriculture has discretion to withhold pay-

The jurisdiction of the Claims Court over certain claims arising under statutes mandating the payment of money has been questioned by the defendant on the basis of *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988). This decision, however, does not foreclose Claims Court jurisdiction over claims such as the present one. In *Bowen,* the Supreme Court implied that the Claims Court might not have jurisdiction over certain administrative review cases where the statute under which the claim was brought was not a money-mandating statute. The Court felt that the Claims Court might not have jurisdiction over claims for payments under such administrative review actions, even though plaintiffs alleged they were seeking the payment of money under a statute. This was felt to be the case because the relief sought was in effect injunctive relief operating prospectively, rather than compensation for past injury. 487 U.S. at 907–08, 108 S.Ct. at 2738–39.

Defendant misreads *Bowen.* In that case, the claim brought originally had been filed in the district court; thus, whether the Claims Court might also have jurisdiction over such a claim never was examined by the Supreme Court, because the issue was not squarely before it. For a detailed discussion on the meaning and effect of the *Bowen* decision, see *Kentucky ex. rel. Cabinet for Human Resources v. United States,* 16 Cl.Ct. 755 (1989). In the absence of precedent requiring otherwise, this court declines to divest itself of jurisdiction over Stevens Farming's claim.

### III. Review of the agency's final decision.

The scope of judicial review of Department of Agriculture determinations is limited by 7 U.S.C. § 1429, which provides: "Determinations made by the Secretary under the Agricultural Act of 1949, as amended shall be final and conclusive: Provided, that the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act." This section is to be read together with 7 U.S.C. § 1385, which provides:

> The facts constituting the basis for any ... [p]ayment ... when officially determined in conformity with the applicable regulations prescribed by the Secretary or by the Commodity Credit Corporation, shall be final and conclusive and shall not be reviewable by any other officer or agency of the Government.

Combined, these statutes have been construed to limit judicial review of factual determinations to whether the USDA acted arbitrarily or capriciously. *Stegall v. United States,* 19 Cl.Ct. 765, 769–70 (1990); *Raines v. United States,* 12 Cl.Ct. 530, 536 (1987). Thus, the court's task here is to review the facts as determined by the Secretary of Agriculture, through his authorized deputy, and to "affirm them unless arbitrary, capricious, or unsupported by substantial evidence." *Stegall,* at 770.

A party is entitled to summary judgment when the pleadings, affidavits, and other papers properly before the court show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. RUSCC 56(c). The burden is on the opponent of the motion to come forth with a showing of genuinely disputed material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560 (Fed.Cir.1987). Furthermore, administrative record review cases are particularly appropriate for disposition by summary judgment. *See, e.g., United States v. Pent–R–Books,* 538 F.2d 519, 527 (2d Cir.

---

ments and to restrict participation in the wheat program under 7 U.S.C. § 1445b–3(c)(1)(C)(iii), then the statute cannot be deemed to mandate the payment of money. The court disagrees. In 1986, the Secretary of Agriculture authorized payments to producers of wheat. If plaintiffs were producers in that year, then the statute would mandate the payment of money to these plaintiffs.

Defendant counters that in any event, section 1445b–3 is not money-mandating for *these* plaintiffs, since Stevens Farming is not a producer, and thus, the court lacks jurisdiction. This argument confuses jurisdiction over the subject matter with prevailing on the merits. If defendant's theory were correct, then every time plaintiffs could not prevail on the merits, there would be no jurisdiction.

1976); *Langston v. Johnson,* 478 F.2d 915, 918 (D.C.Cir.1973).

■ The partnership alleges that the inconsistencies among the various determinations made at the agency level concerning the partnership's eligibility for subsidies indicates that the government did not use a fair and rational procedure for making its decisions. An agency's decision would be arbitrary or capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. v. State Farm Mut.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

The administrative record buttresses the decisions made by the agency, regardless of whether the decision was an approval or disapproval Stevens Farming's application. It is important to note that 7 C.F.R. § 780.12 (1988) provides:

> [N]othing contained in the regulations in this part shall preclude the administrator ... or his designee, on his own motion, from determining any question arising under the Programs to which the regulations in this part apply or from reversing or modifying any determinations made by a state or county committee or the deputy administrator.

Therefore, what may appear to be inconsistencies within the administrative record are allowed by regulation, so long as the Administrator's final decision has a proper basis in the record. This form of review works to ensure that the purposes set out in the regulation—acreage reduction and land diversion—will not be undermined.

The agency's conclusion that Stevens Farming was not a producer was correct, under the relevant statutory and regulatory provisions. Though Stevens Farming might be considered "a person who shares in the proceeds of producing a crop," the six individuals comprising Stevens Farming could not be found to be actively engaged in farming, even though they had each made a contribution of capital to the partnership. Furthermore, even though their share of the profits or losses was commensurate with the capital investment in percentage terms, there was no personal labor or personal management involved, and the individual contributors' capital was at no time put at risk. As counsel for defendant made clear at oral argument, where individuals do not share in the risks of producing a crop, they are not eligible for agricultural subsidies. Otherwise, *anyone* not engaging in farming—any member of the public—could claim entitlement to subsidies for not farming.

A *de novo* hearing on the question of whether the partnership is a producer is not proper here. Stevens Farming requests that it be permitted to examine various agency officials at trial, in order to elicit an explanation of their decision. Granting this request would stand the notion of record review of agency decisions on its head. *See Bank of Commerce v. City National Bank,* 484 F.2d 284, 288 (5th Cir.1973) (action for declaratory judgment concerning Comptroller of the Currency, in which court stated, "when findings of fact, rendered contemporaneously with the concomitant administrative decision, are ... available, a reviewing court may not require the agency officials who participated in that decision to give testimony explaining their action unless there has been a strong showing of bad faith or improper behavior") (relying on *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)). The administrative record is the Deputy Administrator's explanation of his denial of the partnership's application. If the decision is so internally inconsistent or irrational as to require additional explanation by the officials involved, then reversal of the agency decision, not an in-court explanation by agency officials, is the proper course. *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

Still, the court's agreement with the final agency determination that the partnership does not meet the statutory criteria for eligibility for the wheat program does not necessarily entitle the government to sum-

mary judgment. Counsel for Stevens Farming represented to the court at oral argument that lenders routinely require that borrowers be accepted into a federal subsidy program, before extending an agricultural loan. If the catch–22 happens regularly, and applicants situated similarly to Stevens Farming are deemed to be producers and are admitted into subsidy programs, then denying Stevens' Farming's application was arbitrary and capricious. In other words, Stevens Farming may be able to show *de facto* eligibility for the wheat program, based upon past custom and practice of the Department of Agriculture in administering subsidy programs.

The court was concerned about this potential, and asked counsel following oral argument to submit post-argument briefs on this issue. After reviewing the evidence submitted by the partnership, which consists of 65 DASCO decisions and an accompanying memorandum, the court is not convinced that the facts surrounding plaintiffs' application show any *de facto* eligibility. The thrust of the partnership's post-argument submission is that the partnership was justified in relying on the interim approval of the partnership's application. Of the 65 DASCO decisions submitted, not one deals with the court's concern: whether an applicant for a subsidy program, whose financing is contingent on admission into the program, can be admitted to the program. Thus, there is nothing in the record which might lead the court to conclude that the denial of Stevens Farming's application was arbitrary and capricious.

IV. Other bases for recovery.

Stevens Farming has advanced four other theories under which it might recover: equitable estoppel, express contract, implied-in-fact contract, and implied-in-law contract. The court has considered these other arguments, which are discussed below, and finds them to be without merit.

■ The partnership contends that the government is equitably estopped from denying them admission into the wheat program, in light of the interim decision which gave the state commissioner the authority to approve the partnership's application.

However, equitable estoppel cannot form the basis for a money claim against the United States government. *Office of Personnel Management v. Richmond,* —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

■ In addition, the partnership has not even shown that the traditional elements of estoppel have been met. The party against whom estoppel is asserted must know the facts and intend that his conduct be acted upon, or act in such a way that the party asserting estoppel has a right to believe it is so intended; furthermore, the party seeking to invoke estoppel must be ignorant of the true facts, and must have relied on the other party's conduct to his detriment. *United States v. Georgia Pacific,* 421 F.2d 92, 96 (9th Cir.1970).

Stevens Farming could not have relied on the interim approval to its detriment, since plaintiffs did not learn of the interim approval until after they filed their complaint with this court. To the extent that the partnership relied on the statements of various agency officials, such reliance was unreasonable, as the statements were laden with conditions and qualifiers.

■ The partnership argues further that an express contract was formed between the partnership and the United States. The application form, which was an offer to enter into a contract, was signed by the partnership. However, no one with authority to bind the government ever returned a signed acceptance to the partnership, and thus, no contract was formed. *See Thanet Corp. v. United States,* 591 F.2d 629, 219 Ct.Cl. 75 (1979) (where offeror must know of acceptance to determine its subsequent action, and where offeree has reason to know this, a notice of acceptance must be given before an enforceable contract arises).

■ The partnership's argument, based on the July 9, 1986 ASCS letter, that an implied-in-fact contract arose between the partnership and the United States, also fails. In order to find an implied-in-fact contract, there must be an offer, acceptance, consideration, and mutuality of in-

tent. *Chavez v. United States,* 18 Cl.Ct. 540 (1989); *Wertz v. United States,* 2 Cl.Ct. 45, 51–52 (1983). The last paragraph of the July 9, 1986 letter clearly indicates that the approval was conditioned upon the committee's receipt of evidence showing that the partners were separate entities for purposes of the payment limitation. There was no mutuality of intent; the letter carried no indicia of definiteness and did not even address the issue of whether the partnership was a producer for purposes of the program. Furthermore, the partnership did not supply consideration. To the extent that consideration was supplied—in land reduction and soil conservation at Mizpah Farm—it was supplied by First Continental, not by Stevens Farming.

■ Finally, the partnership argues that the court could base recovery on a contract implied-in-law. However, the Claims Court lacks jurisdiction to grant relief based on this purely equitable doctrine. *See United States v. Mitchell,* 463 U.S. 206, 218, 103 S.Ct. 2961, 2968–69, 77 L.Ed.2d 580 (1983); *Chavez, supra.*

## CONCLUSION

Theodore Stevens' claims are DISMISSED. With respect to the partnership's claim, the agency decision must stand, therefore, the government's motion for summary judgment is GRANTED. The Clerk is directed to enter judgment accordingly.

